Paul C. Wilson, Judge,
dissenting.'
The central question addressed in the principal opinion is whether, under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Clemons’ claim that the state failed to disclose Probation Officer Weeks’ subjective impression of Clemons’ physical condition — an impression that Weeks formed several hours after Clemons claims two police detectives beat him into giving an audiotaped statement — is a sufficient ground to vacate Clemons’ convictions and death sentences now, more than 20 years after his trial. It is not. There was no failure to disclose in this case. The state produced to the defense Weeks’ name, his job, and the document on which Weeks supposedly noted this observation long before trial. More importantly, Clemons already, knew about Weeks’ impression because Weeks remarked to Clemons about it at the time.
Even if the state had not disclosed all of this before trial, which it did, Clemons fails to show the type of nondisclosure that, under Brady, requires relief. Brady only applies to two types of evidence: exculpatory evidence concerning guilt or punishment, and impeachment evidence concerning the credibility of a witness who might be determinative of guilt or punishment. Weeks’ evidence is neither. Weeks’ subjective impression of Clemons’ appearance formed hours after Clemons’ interrogation ended has no bearing on whether his au-diotaped statement was voluntary. Instead, as Special Master Michael Manners found (and the principal opinion agrees), Weeks’ evidence merely impeaches the credibility of other ancillary witnesses who corroborated the detectives’ denials at the suppression hearing by testifying that Clemons did not- appear injured in the hours and days’ 'after' he gave his statement. ' Accordingly, Weeks’ evidence is not the sort of evidence to which Brady applies.
Finally, even if Weeks’ evidence qualified as exculpatory or impeachment evidence under Brady, Clemons is not entitled to relief unless that evidence was material, i.e., unless there is a reasonable probability that the jqry’s verdicts would have been different had the. evidence been disclosed. To establish materiality, Clemons makes a two-step argument: (1) there is a. reasonable probability that, if the trial court had heard Weeks’ evidence, it would have suppressed Clemons’ audiotaped statement; and (2) there is a reasonable probability that, if the jury had not heard Clemons’ statement, it would not have convicted him and recommended that he be sentenced to death. Any fair reading of the Master’s Amended Final Report (the “Report”) shows that the Master never reached this second step and, if he had, .that Clemons’ claim would have failed.
The- Master spends most-of the first 100 pages of the Report reviewing the records of Clemons’., trial (and the trials of Clemons’ accomplices Gray and Richardson), together with the records of Clemons’ state post conviction prbceedings and federal ha-beas review. Only after conducting this exhaustive analysis did the Master draw his conclusion regarding the Weeks Brady claim. Clemons quotes bits and pieces of the Masteris critical conclusion, but that approach fails to do justice to the Master’s Report: Instead, to avoid any distortion, the Mastér’s conclusion is set forth below, in its entirety:
*90 Clemons does not have to demonstrate that disclosure of Weeks’ knowledge of injury and the , obscured form “would have resulted ultimately in [Clemons’] acquittal.” Woodworth, 396 S.W.3d at 338. It is enough if there is a reasonable probability of a different result. Ibid. This element is satisfied “when the favorable evidence could reasonably be taken to put the whole case in such different light as to undermine the' confidence in the verdiet.” Engel v. Dormire, supra, 304 S.W.3d at 128.
I believe Clemons has satisfied that standard. The importance of Warren Williams’ testimony was emphasized by this Court in its original Opinion, affirming the trial court’s denial of the motion to suppress Clemons’ confession, 944 S.W.2d at 218. The contradiction of his testimony by Weeks is a method of impeachment. Maugh v. Chrysler Corp., 818 S.W.2d 658, 661 (Mo.App.1991). In the criminal case, Weeks’ testimony may have resulted in the trial court sustaining the motion to suppress, in which case, Clemons’ confession would never have been heard by the jury.
The state has suggested that harmless error would protect the jury verdict, even if Clemons’ confession had been suppressed. It seems to me that the State’s argument is contrary to Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), where the Supreme Court held that once a violation' of Brady and its progeny is shown, “there is no need for further harmless-error review.”
This is a troubling outcome for me, because we do not know if Weeks’ recollection of the evidence is consistent with other. people in the Pretrial Release Unit, for example, Commissioner Edwards, who, according to the LAD Report, observed no injuries to Clemons at 5:49 a.m. I am dubious that the suppression of Clemons’ statement would have made much difference in this case, due to the strength of the evidence, but the holding of Kyles, supra, would seem to suggest that the question of harmless error is not pertinent where there is a Brady violation.
Master’s Report, at 103-104 (emphasis added).
As an experienced jurist and accomplished wordsmith, the Master is entitled to have the language of his conclusion read with precision and care. Concerning the first step of Clemons’ argument, the Master concluded that the disclosure of Weeks’ evidence “may have resulted” in the trial, court suppressing Clemons’ statement. Report at 103 (emphasis added). This is insufficient. See Strickler v. Greene, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (holding that a reasonable probability that the undisclosed evidence “might have” altered the outcome is insufficient because Brady requires a reasonable probability that the undisclosed evidence “would have” altered the outcome).
More importantly, the Master determined that he was not permitted to address the second step of the materiality analysis (i.e., whether there is a reasonable probability that, if Clemons’ statement had been suppressed, the jury would not have convicted him and recommended that he be sentenced to death). The Master declined to . reach this second step based on his understanding of Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In characteristically unambiguous language, however, the Master proceeded to tell this Court precisely what conclusion he would have reached if he had proceeded to this second step: “I am dubious that the suppression of Clemons’ statement would have made much difference in this case, due to the strength of *91 the evidence” against Clemons. Report at 104 (emphasis added). This statement is critically important because the Master misconstrued — or, more likely, was misinformed about — the holding in Kyles.
Kyles does not hold that courts must ignore the strength of the evidence against defendant when deciding whether undisclosed evidence was material for Brady purposes. Just the opposite. Kyles affirms that there is nó violation of due process under Brady unless and until the defendant shows a reasonable probability that disclosure of the withheld evidence would have resulted in a different verdict on guilt or punishment. Kyles, 514 U.S. at 437, 115 S.Ct. 1555. That showing cannot be made when the case against the defendant remains overwhelming, even when viewed in light of the undisclosed evidence. Id. To make the required showing of materiality, therefore, the defendant must show that the remaining evidence is not overwhelming. Accordingly, Kyles merely draws the logical conclusion that — once the defendant shows that the undisclosed evidence was material (i.e., that the evidence of guilt was not overwhelming) — the state’s failure to disclose that evidence can never be considered “harmless.” Id. In context, there can be no doubt that Kyles confirms the central importance under Brady of evaluating the weight of the-remaining evidence against the defendant because the bulk of the Court’s decision is devoted solely to that question. Id. See also Smith v. Cain, — U.S. -, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012) (undisclosed impeachment evidence “may not be material if the State’s other evidence is strong enough to sustain confidence in the verdict”) (emphasis added).
If the Master reached the second step of Clemons’ materiality argument, as Kyles and Smith say’ he should have dope, he made it clear that he. would have denied Clemons’ Brady claim. Even if Clemons’ audiotaped statement had been suppressed,. the Master stated that there was no reasonable probability that the jury’s verdicts would have changed because the other evidence against Clemons was so strong. No other reading of the.Report is faithful to the Master’s painstaking review and analysis of the evidence establishing Clemons’ guilt and punishment, and no other reading of Kyles is faithful to that decision and the Supreme Court’s subsequent Brady cases.
If the Court is not convinced that this is the conclusion the Master would have drawn if he had reached the necessary second step of the Brady materiality analysis (and it is hot convinced by the other independent and adequate grounds to deny relief),' the' answer is not to .vacate Clemons’ conviction. Instead, the only reasonable answer is to remand the case to the Master for the limited purpose of having him apply the proper legal standard, to the facts he.already has found and .thoroughly analyzed throughout the Report. What is not reasonable, however, is for the Court to put words in the Master’s mouth by purporting to affirm a conclusion he did not make.
I. Litigation — Past and Present
In 1993, Clemons was convicted of murdering Julie and-Robin Kerry- and giveii two death sentences. All of his claims of error were rejected by this Court, State v. Clemons, 946 S.W.2d 206 (Mo. banc 1997), and the Supreme Court of the United States declined to review those claims, 522 U.S. 968, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997): All claims that Clemons could have raised and did not raise in this appeal were waived. Matthews v. State, 175 S.W.3d 110s, 115 (Mo. banc 2005).
Rule 29.15 provided Clemons with the “exclusive procedure” for raising claims *92 that his death sentence's exceeded- the maximum punishment allowed by law, that the trial court lacked jurisdiction to impose those sentences, or that his convictions or sentences resulted from-a violation of his rights under the state or federal constitutions. Rule 29.15(a). With the help of new lawyers, Clemons asserted more than 25 of these “post conviction” claims and acknowledged that, pursuant to Rule 29.15(d), he was waiving all claims other than those he raised. After extensive discovery and a hearing, Clemons’ Rule 29.15 motion was overruled. This- Court affirmed that decision, Clemons, 946 S.W.2d at 221, and the Supreme Court declined to review Clemons’ post conviction claims. 522 U.S. 968, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997).
Clemons then moved to the’ federal courts. There, another new- group of lawyers challenged many of this Court’s rulings and asserted various new claims that had never been presented to this or any other state court. After more discovery and another hearing, the federal district court denied all of Clemons’ claims — save one. Clemons v. Luebbers, 212 F.Supp.2d 1105, 1122 (E.D.Mo.2002) (vacating Clemons’ death sentences because certain jurors were excluded who stated they could not sentence Clemons to death if he did not actually push one of the two victims to her death). On appeal, however, that claim — and-all of the others — were denied, Clemons v. Luebbers, 381 F.3d 744 (8th Cir.2004), and the Supreme Court declined to review, those claims, 546 U.S. 828, 126 S.Ct. 41,163 L.Ed.2d 75 (2005).
The trail of litigation described above leads to Clemons’ cuirent, petition for writ of habeas corpus, which was filed in this Court on June 12, 2009 (the “2009 Petition”). Given Clemons’ many opportunities, to litigate his claims (all of which have been denied at least twice, and some as many as four times), and given that he long ago waived all unasserted claims, one may reasonably ask, “What’s left?” The answer, properly, is: “Not much.”
First, an inmate is entitled to relief-even at this late date — if he discovers “new evidence” (i.e., evidence that was not — and through the exercise of reasonable diligence could not have been — known earlier) constituting “clear and convincing” proof that he did not commit the crimes.[1] State ex rel. Amrine v. Roper, 102 S.W.3d 541, 548 (Mo. banc 2003). This type of claim is referred to as - a “freestanding” claim of actual innocence because the inmate does not have to show-that his cpnviction-result-ed from a constitutional violation. Clear and convincing proof of actual innocence, standing alone, is sufficient to merit relief. Id.
An inmate may also- raise a new constitutional claim at this point if, but only if, the inmate can establish an adequate excuse for failing to raise the claim earlier. There are only two such excuses: (1) proof of actual innocence that, though it does not meet the Amrine standard of “clear and convincing,” is sufficient to show that the inmate’s actual innocence is “more likely than not,” Schlup v. Delo, 513 U.S. 298, 315, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); or (2) proof that there was both (a) an *93 external “cause” that prevented the inmate from asserting the claim earlier and (b) extraordinary “prejudice” that resulted from the constitutional violation, Murray v. Carrier, 477 U.S. 478, 485-87, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Accordingly, after- all state and-'federal reviews are finished, an inmate can only assert a new constitutional claim if he- can pass through either the gateway of “actual innocence” or the gateway of “cause and prejudice.”
In the 2009 Petition/ Clemons raises only the first category of claims, i.e., a so-called “freestanding” claim of actual innocence. By the time final arguments were presented to the Master, however, Clemons was asserting new- constitutional claims under both the “actual innocence” and “cause • and ■ prejudice” gateways. These claims are addressed separately below.[2]

II. Freestanding Claim of Actual Innocence

In the 2009 Petition, Clemons identifies the following “new evidence” to support his claim of actual innocence: (1) a 1993 civil suit against the City of St. Louis by Thomas Cummins (the only victim to survive the encounter with Clemons and his accomplices on the Chain of Rocks Bridge) in which Cummins alleges that police detectives assaulted him in an effort to make him confess that he — not Clemons and the three other strangers Cummins described in his initial recorded statements — was responsible for the deaths of Julie and Robin Kerry; and (2) a 1995 settlement payment from the City in the amount of $150,000 to resolve Cummins’ lawsuit. This “new evidence,” Clemons claims, constitutes “clear and convincing” proof that he is innocent. This is the claim — the only claim — that the Master was appointed to hear.[3]
A. “Cummins Did It” — the (Nearly) Final Refrain
At trial, Clemons (like Gray, who was tried and convicted before Clemons) relied heavily on a defense theory that attempted to portray Cummins as the sole perpetrator of these crimes. The cornerstone of this theory was that, within hours of swimming to shore and hailing police, Cummins supposedly “confessed” that he — alone— was responsible for the deaths of his cousins on the bridge that night.
The two audiotaped statements that Cummins gave, to the police within hours of the incident, however, contain no hint of this “confession.” Instead, the Master concluded that — among all those who testified about the events on the bridge on April 5, 1991 — Cummins was the “most honest man in this forest of deceit.” Report at 91. These two lengthy taped (and transcribed) statements, like Cummins’ trial testimony, “gave an account that was internally consistent in all major details through several iterations and which was borne out by the independent testimony of Daniel Winfrey, who wás hardly his friend.” Report at 91. In contrast, not *94 only was Cummins’ .supposed “confession” not recorded, but Cummins also has, consistently and vehemently denied that he ever made any such inculpatory statements. ...
Having built his defense on the theory that Cummins was the “real” killer, it is not obvious how Clemons’ “new evidence” (which he claims proves that Cummins’ supposed “confession” resulted solely from police abuse) constitutes, clear and convincing proof that Clemons did not rape and murder Julie and Robin Kerry. Presumably, Clemons is not arguing that statements made under such duress are more reliable than statements freely made. In any event, the Master, demonstrating a commanding knowledge of the record, made short work of Clemons’ freestanding claim of actual innocence:
Of course, if newly discovered evidence would make it more likely than not that no reasonable juror would have convicted Clemons because Cummins was the perpetrator, that dog might' hunt, "but the truth is, it will not. The time has finally come to drive a stake through the heart of the shibboleth that Thomas Cummins is the murderer tesponsi-ble for the deaths of the Kerry sisters.
Report .at 87 (emphasis added).
As the Master explained, it was the flashlight Clemons left behind on the' bridge that led police to question, in turn, Richardson, Clemons, Gray, and Winfrey. Despite the evolving and self-serving nature of their statements, they collectively corroborated , Cummins’ initial recorded statements and erased any possibility that Cummins was the killer. Report at. 88. The Master reasoned that, if Cummins was the killer and Clemons et al. were uninvolved, there is no way to explain: (1) why Cummins’ watch would end up in Gray’s possession; (2) why DNA evidence would “show[] conclusively that Gray had sex with at least one of the Kerry sisters” before she fell to her death from the bridge; (3) why Winfrey would plead guilty to two counts of murder and two counts of rape he did not commit; (4) why Richardson’s lawyer would concede to the jury (with no objection from his client, then or ever) that Richardson “should go away to prison for a very long time” for what he did on the bridge that night; and (5) why Clemons, even at this late date, would still refuse to answer questions under oath about his role in the rapes and murders of Julie and Robin Kerry. Report at 88-90. " ‘
The Master patiently explained to Clemons that, because a claim for habeas relief is a civil case, Clemons had no Fifth Amendment right to refuse to answer the questions put to him during the hearing before the Master. As a result, the Master explained to Clemons that, if Clemons persisted in answering some questions and refusing to answer others, the Master would treat Clemons’ refusal to answer as if he had answered in a manner damaging to his claims. Clemons acknowledged that he understood these consequences but, nevertheless, refused to answer the following questions:[4]
*95 • Whether Clemons and .Gray initially restrained Cummins while Winfrey and Richardson grabbed Julie and Robin Kerry. - :
• Whether ' Clemons told Cummins, “Don’t move or you’ll get shot/’
• Whether one of the girls urged the other not to fight as Clemons, Richardson and Gray were raping them.
• Whether Clemons raped both girls,
• Whether, when they had finished raping the girls, Gray left the= bridge.
• Whether Clemons heard Richardson say they had to get rid of the girls so they wouldn’t leave any witnesses and go to jail, and did not respond.'
• Whether Clemons watched Richardson put the first girl down the manhole.
• Whether Clemons put the second girl down the manhole.
• Whether Clemons put Cummins down the manhole.
• Whether, once the three victims were on the platform below the bridge deck with Richardson, Clemons told Winfrey to find Gray and bring him back.
• Whether Clemons joined Richardson and the three victims on the platform.
• Whether Clemons saw Julie and Rob.in being pushed from the bridge pier into the river.
• Whether Clemons heard Cummins being told to jump or he was going to get shot. •
• Whether Clemons and Richardson then ran back to the Missouri side of the bridge, where they met Gray and Winfrey coming back onto the bridge.
• Whether Clemons told Gray and Winfrey, “Let’s go. We threw them off.”
• Whether, referring to the three victims, Clemons later told Richardson, Gray, and Winfrey: “They’ll never make it to shore.”
Report at 90-91 (citing Master’s Hearing at pp. 383-88).
The Master’s Report concludes: “I infer from his refusal to answer those questions that, if he were truthful, Clemons’ answers to every one of those questions would have been damaging to him.” Report at 91 (emphasis added). No claim of innocence can survive such admissions.

B. Clemons’ “New Evidence” Is Not New

The Master also pointed out that Clemons’ new evidence regarding Cummins’ 1993 lawsuit and 1995 settlem.ent is not “new” in any sense of the word; Report at 92-93. To the contrary, Clemons filed copies of newspaper stories that described the suit and the settlement in 1995 in his state post conviction proceedings. Report at 93.
Not only did Clemons have knowledge of all of this so-called “new evidence” in 1995, the Master noted that Clemons had access' to Cummins’ ¿negations'of coercion (and the possibility that he would file suit against the City) long before Clemons’ trial. All Clemons’ counsel needed to do to acquire this information was depose Cum-mins and ask him. Report at 92-93. Because the facts underlying Clemons’ “new evidence” were in his possession since at least 1995, ánd because those same facts were reasonably available to Clemons even before his trial, the Master concluded Clemons hád no excuse for waiting 14 years before claiming this evidence proved his innocence. ‘ Report' at 93-94. “Evidence is ‘new’ only if it was ‘not available at trial and could not have been discovered *96 earlier through the exercise of due diligence.’ ” Report at 96 (quoting State ex rel. Nixon v. Sheffield, 272 S.W.3d 277, 284-285 (Mo.App.2008)).

C. Clemons’ Newest “New Evidence” Is Not New Either

Clemons also argues that two .additional pieces of “new evidence” — nowhere mentioned in the 2009 Petition — also constitute clear and convincing proof of innocence. First, Clemons relies on a 2012 deposition in which Cummins testifies that one of the four attackers said he wanted to let Cum-mins live, but that Cummins did not know which of the men made this comment. When Clemons’ counsel pressed Cummins to admit that it could have been Clemons who made the statement, Cummins admitted that was possible. As a result, Clemons claims this is “new evidence” that proves he is innocent. The Master appropriately assessed this argument as “silly.” Report at 96.
Cummins’ 2012 testimony on this issue is the same as his audiotaped statements to the police within hours of the murders. Transcripts of these taped statements were admitted into evidence in Clemons’ trial, and Cummins even testified on this subject. That Cummins gave substantially the same answer in a deposition 21 years after trial does not make this information “new evidence.” Cummins was readily available prior to trial and, through the exercise of reasonable diligence, Clemons’ counsel could have explored his recollection about this statement then. Accordingly, the Master concluded that Clemons cannot now rely on this information as “new evidence” of actual innocence.
Finally, Clemons contends that he has dramatic new evidence of actual innocence from a previously untapped source: himself. Because Clemons now claims that he did not kill Julie and Robin Kerry, and that he did not know about any explicit plan to kill them, he insists this is “new evidence” that constitutes clear and convincing proof of his innocence. As above, the ’Master rejected this argument because — even though Clemons’ protestations of innocence are new — the information contained' in his statements is not. Clemons has always known what role he did (or did not) play in the murders of Julie and Robin Kerry. Accordingly, the Master properly concluded.that Clemons cannot assert his Fifth Amendment right not to testify at trial, wait 20 years, and then profess his innocence (albeit while refusing to answer questions about the incident) in order to claim that his last-minute denials are “new evidence.” The Report concludes: “Clemons certainly had a. ‘previous opportunity to litigate’ the claim that his own testimony would exonerate him: It was called a trial.” Report at 97 (quoting State ex. rel. Nixon v. Jaynes, 68 S.W.3d 210, 214 (Mo. banc 2001)).

III. Gateway Claims of Constitutional Violations

The Court appointed the Master to hold a hearing on the freestanding claim of actual innocence asserted in Clemons’ 2009 Petition. The Master rejected this claim so thoroughly that Clemons now makes only passing reference to it. But Clemons did not stop there. Even though he did not allege any new constitutional claims in the 2009 Petition[5] — let alone allege facts *97 sufficient to satisfy one of the two “gateways” for such claims — Clemons argued three new constitutional claims that he insisted were grounds to set him free. The Master analyzed each of these un-pleaded claims, beginning with whether Clemons could satisfy one of the two “gateways” allowing him to raise any new claim at this late date.
As explained above, the first gateway permitting an inmate to raise a previously waived constitutional claim is proof that the inmate is “more likely than not” actually innocent. The Master found Clemons could not use that gateway. Not only do Clemons’ claims of innocence fail to meet the “clear and convincing” standard for a standalone claim under Amrine, the Master also rejected the claim that Clemons’ innocence was “more likely than not.” Instead, the Master concluded: “I do not believe Clemons has established a gateway claim of actual innocence.” Report at 97.
To satisfy the one remaining gateway, Clemons must prove: (a) sufficient “cause” to justify why he did not — and could not— have raised the claim earlier; and (b) sufficient “prejudice” to show that the alleged constitutional violation actually, affected the outcome of his trial. Murray, 477 U.S. at 488, 106 S.Ct. 2639; State ex rel. Woodworth v. Denney, 396 S.W.3d 330, 337 (Mo. banc 2013). Before evaluating whether Clemons can establish the elements of this “cause and prejudice” gateway, it is important to note how they relate to the elements of the constitutional claim Clemons is trying to raise.
Clemons argues that the state failed to disclose three items of evidence that he believes would have been' helpful to him at trial. Under Brady, it is a violation of due process requiring a new trial when: (1) the state fails to disclose exculpatory evidence relevant “to guilt or to punishment,” Brady, 373 U.S. at 87, 83 S.Ct. 1194, or impeachment evidence undermining credibility when “the ’reliability of a given witness may well be determinative of guilt or innocence,” Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); and (2) the undisclosed evidence is material, Le., there is a reasonable probability that — if the evidence had been disclosed — the jury’s verdicts would have been different.[6] United States v. Bagley, 473 U.S. 667, 682, 685, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). .
*98 At first glance, the elements of the “cause and prejudice” gateway seem to be identical to the Brady elements of “nondisclosure” and “materiality.” Certainly this is true with respect to “prejudice” and “materiality,” and any evidence sufficient to meet one ‘ of these elements will be sufficient to, -meet the other. Banks v, Dretke, 540 U.S. 668, 691, 124 S.Ct, 1256, 157 L.Ed.2d 1166 (2004) (“prejudice within the compass of the ‘cause and prejudice’ requirement exists when the, suppressed evidence is ‘material’ for Brady purposes”). As the Master pointed , out, however, proof of “nondisclosure” of exculpatory or impeachment evidence does not necessarily constitute proof of sufficient “cause” to excuse an inmate’s failure to assert a particular Brady claim earlier. Report at 98. Accordingly, each of these elements is examined below in the context of Clemons’ new Brady claims.
A. Draft Police. Report — the (Truly) Final Refrain of “Cummins Did It”
Clemons’ first Brady argument is based on the'state’s failure to disclose a draft of a police incident report of the events on the Chain of Rocks Bridge. This draft report, Clemons asserts, proves that it was Cummins — not Clemons et al. — who killed Julie ánd Robin Kerry. As recounted above, the Master’s Report explains that no matter how many different times or how many different ways Clemons relies on the “Cummins did it” theory, that pooch simply will not hunt. Report" at 87. Accordingly, even if Clemons had known of the draft police report prior to trial, he cannot show a reasonable probability that the “Cummins did it” theory ever would have convinced the jury not to convict him or not to recommend the death penalty.
But the Master did not dispose of this first Brady claim for lack of “prejudice” or “materiality.” Instead, the Master noted that Clemons has no one to blame but his own lawyers for not having the draft police report before trial. With reasonable diligence, defense counsel could have obtained this' report. Therefore, the Master concluded Clemons failed to establish either “nondisclosure” under Brady or “cause” under Murray.
The rule in Brady is limited to discovery, after trial, of information which had been known to the prosecution, but unknown to the defense, Nassar v. Lissel [Sissel ], 792 F.2d 119, 121 (8th Cir. 1986). Thus, evidence is not suppressed for Brady purposes “if the defendant had access to the evidence prior to trial by the exercise of reasonable diligence,” U.S. v. Stuart, 150 F.3d 935, 937 (8th Cir.1998). “If the defendant had knowledge of the evidence at the time of trial, the State cannot be faulted for nondisclosure.” State v. Salter, 250 S.W.3d 705, 714 (Mo. banc 2008). Moreover, to get this Court to undertake habeas review of Clemons’ claim, he must “establish that the grounds relied on were hot ‘known to him’ during his direct appeal or post-conviction case” State ex rel. Engel v. Dormire, 304 S.W.3d 120, 126 (Mo. banc 2010). I do not believe the evidence presented to me established a Brady violation simply because the State refused to produce a record whose existence was fully known to Clemons.
Report at 98 (emphasis added).
Accordingly, because Clemons’ defense counsel had sufficient information to know the document existed, and because counsel could have obtained the report before trial through the exercise of reasonable diligence, the Report properly concludes that Clemons’ first Brady claim must be rejected.

*99
B. Rape Kit

Clemons’ second Brady claim consists of his contention that the state failed to disclose a “rape kit” taken during the autopsy of Julie Kerry’s body. Because the “rapé kit” shows there was * no seminal fluid found in or on - Julie’s body at the time of her autopsy, Clemons insists his convictions must be set aside. He insists that, because this evidence was relevant both to his guilt and his punishment, there is a reasonable probability Clemons would not have been convicted and sentenced to death if it had been disclosed. The Master properly rejected this claim.
Clemons’ argument ignores the fact that Julie’s body was not recovered from the Mississippi River until three weeks after her murder. This accounts for the lack of any semen in or on the body at the time of the autopsy. Report at 98. Clemons’ 'argument also ignores1 the evidence that Clemons was seen distributing condoms before the attack, and that a condom recovered from the scene showed a definite match to Gray’s DNA. Report at 89.'
The state has no duty under Brady or due process “to share all useful information with the defendant.” United States v. Ruiz, 536 U.S. 622, 629, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002). Instead, Brady applies only to evidence that is exculpatory evidence (i.e., relevant “to guilt or punishment,” Brady, 373 U.S. at 87, 83 S.Ct. 1194) or impeachment evidence (i.e., “affecting credibility” when the “reliability of a given,witness may well be determinative of guilt or innocence,” Giglio, 405 U.S. at 154, 92 S.Ct. 763). Here, the Master concluded “Clemons does not show that there is even a remote possibility that a rape kit performed under the circumstances existing in this cáse could reasonably be expected to show anything.” Report at 98 (emphasis added), “[E]ven if there had been semen in the vagina at one time, after three weeks in the river, it would not be present.” Report at 99. . Accordingly; even though there is no doubt that Clemons proved “cause” because Clemons did not-know (and-could not:have known) of the “rape kit” any earlier, the. Master concluded Clemons failed to prove “nondisclosure” under Brady because the “rape kit” did not i qualify as exculpatory evidence or impeachment evidence.
Whether evidence qualifies as exculpatory {Brady) dr impeachment (Giglio) deals exclusively with the nature Of the evidence. Once the undisclosed evidence qualifies under Brady or Giglio, the relative weight or probable impact of the evidence on the jury’s verdicts is addressed under the “materiality” element. Of course, evidence that is not exculpatory and that does not tend to impeach a key witness cannot— logically — be material under Brady. Therefore,' the Master also properly concluded that Clemons’ “rape kit” claim must fail because there was no reasonable probability “that disclosure of the rape kit would have caused the result of the trial to be different.” Report at 99.

C. Probation Officer Warren Weeks

At 10:13 p.m. on April 7, 1991, Clemons finished giving his audiotaped statement to detectives in which1 Clemons: (a) admits raping Julie and Robin Kerry' but (b) denies pushing (or helping anyone else push) them to their deaths. Though Clemons was under arrest at that time, the detectives continued to hold him in an interrogation room in the homicide division in the 7th Street headquarters. At 2:15 a.m. on April 8, Detective Pappas escorted Clemons to the men’s “holdover” facility in the same building. There, Clemons was booked and, at 2:40 a.m., he was photographed and fingerprinted.
At 5:42 a.m., Clemons was interviewed by Commissioner Yvonne Edwards of the St. .Louis Pre-Trial Release (“PTR”); office. This interview was part of the pro *100 cess-to see which new arrestees are eligible to be released on a pre-set bond (or their own recognizance) without an initial court appearance. When detectives from Internal Affairs investigated Clemons’ later allegation that the detectives had assaulted him prior to his taped statement, Commissioner Edwards told them that she recalled her interview with Clemons. She said that Clemons had no apparent injuries to his face or elsewhere at that time and that he said nothing to suggest that he had been assaulted by anyone.
At 5:25 a.m., however, just minutes before this interview with Commissioner Edwards, Clemons was “pre-interviewed” by Warren Weeks. Weeks was a Probation and Parole officer assigned to the PTR office as a bond investigator. The purpose of Weeks’ pre-interview was to question Clemons and, using his answers, fill out Clemons’ Pre-Trial Release report. This report would then be checked and completed by Commissioner Edwards.
Weeks characterized Clemons as “not reluctant” and testified that he was “as talkative as other. prisoners.” Using Clemons’ answers, Weeks filled out the portions of Clemons’ PTR report that dealt with his residence, family, friends, employment and education. When he reached the third page of the form, Weeks asked Clemons about his physical condition. Weeks checked the box on the form marked “No Problems” because that is what Clemons told him. On the blank lines below this “No Problems” box,' however, Weeks wrote the words “Asthmatic — Medications” because Clemons said that he had asthma that required medication.
Eighteen years later, at his deposition in October 2012, Weeks testified that — even though Clemons said he had “no problems” — Weeks remembered seeing a large swelling on Clemons’ right cheek that was “between the size of a golf ball and a baseball.” Weeks admits he did not think that Clemons had been hit.[7] When Weeks remarked to Clemons about the swelling, Clemons — who appears to have responded to everything else — did not respond or otherwise confirm Weeks’ impression. In sum, Weeks concedes that he did not ask Clemons what caused the apparent swelling and admits that Clemons did not say— or even suggest — that he had been beaten by detectives at any time or for any reason.
Despite Clemons’ failure to mention any injury to his cheek when Weeks asked about his physical condition and, more importantly, despite Clemons’ failure even to acknowledge Weeks’ comment about a swelling on the side of his face, Weeks testified in 2012 that he felt compelled to make a note about this swelling on Clemons’ PTR report. But Weeks did not use the portion of the form devoted to Clemons’ physical condition to give a complete description of the location, extent, or apparent .age of the swelling. Nor did Weeks note that the swelling was “between the size of a golf ball and a baseball.” . Instead, Weeks testified in 2012 that he simply wrote the word “bruise” on Clemons’ PTR report, or maybe it was “bump;” Weeks does not remember.
The word “bump” may have been written just below Weeks’ note concerning Clemons’ asthma, but the word has been crossed out and is illegible. Weeks testified that he did not cross out the word on the morning of April 8, 1991, which is the last time he saw the form (or Clemons). But Weeks also admits that he does not *101 know who did cross the word out or, more importantly, when this was done.
In 1991, Weeks’ supervisor asked Weeks about what he had seen, on Clemons’ face and questioned whether there was anything for Weeks to see. The prosecutor also met with Weeks and showed; him pictures of Clemons taken shortly before , and after Weeks’-interview with him. Weeks concedes those photos' showed no injury, let alone a swelling between the size of a golf ball and a baseball, but neither the photographs nor the fact that Commissioner Edwards observed no swelling or other injury to Clemons’ cheek just seconds after Weeks left him had any effect onWeeks or his story. •
Weeks admits that the prosecutor-did not try to rhaké-him change his story or keep the matter secret. Free to tell anyone what he remembered, Weeks never contacted Clemons’ counsel, and they never contacted him. Clemons, of course, knows best who he-met with in the hours and days following the interrogation, particularly those who volunteered remarks about an apparent injury to Clemons’ face. Yet defense counsel made no effort .to depose Weeks prior to Clemons’ suppression hearing and trial, even though the state disclosed him as a potential witness and disclosed-that he had been working at PTR in the early morning of April 8 when Clemons was booked. Like Clemons’ trial counsel, Clemons’ subsequent lawyers never questioned Weeks at any time during Clemons’ lengthy state and federal post conviction proceedings. It was not until 2012, when Weeks reached out to the defense after hearing about the Master’s proceedings at his home in Texas, that Clemons’ counsel questioned Weeks about what he remembers seeing more than 20 years earlier.
Because Clemons did not plead this claim in his 2009 Petition (or anywhere else), he has never had to specify precisely what it is about Weeks that the state failed to disclose. Clemons knows who he met with during the early morning hours of April 8 and certainly should remember the only person who supposedly volunteered a remark . about the swelling. on Clemons’ cheek. Of course, Clemons might not remember that person’s name. But the state disclosed Weeks’ name and the fact that we was working at 7th Street PTR in September 1992, long before Clemons’ trial. Legal File, at p. 505. . This leaves only Clemons’ PTR report, which Weeks prepared. But the state also disclosed Clemons’ PTR report in February 1992, more than a year before Clemons’ trial. See Clemons’ Criminal Trial Legal File, at p. 506.[8] Accordingly, the state produced all it had, and Clemons had all he needed to ask Weeks about what Weeks thought he saw on Clemons’ face.
Clemons ignores the state’s disclosure of the PTR report, Weeks’ name, Weeks’ job, *102 and the fact that Weeks’ was working in PTR early on April 8, 1991. Instead, Clemons argues that the state failed to disclose Weeks’ subjective-impression concerning Clemons’ appearance and physical condition that night. As with' the “draft police report” discussed previously, however, this is information that Clemons had and/or could have obtained with reasonable diligence. Accordingly, Clemons cannot demonstrate sufficient “cause” for failing to assert this claim earlier and — even if he could — the state’s failure to disclose this information was not a “nondisclosure” under Brady. ■ ■
1. “Nondisclosure” under Brady
Brady does riot apply to all evidence that. might be “helpful” to the' defense. Instead, it only applies to exculpatory evidence, i.e., “evidence [that] is material either to guilt or punishment.” Brady, 373 U.S. at 87, 83 S.Ct. 1194. See also Merriweather v. State, 294 S.W.3d 52, 54 (Mo. banc 2009) (Brady applies to “evidence [that] is material either to guilt or punishment”) (emphasis added); State ex rel. Engel v. Dormire, 304 S.W.3d 120, 126 (Mo. banc 2010) (same). Later, Brady was extended to impeachment evidence. Giglio, 405 U.S. at 154, 92 S.Ct. 763. But Giglio does not extend Brady to all impeachment evidence, only “evidence affecting credibility” where the “reliability of a given witness may well be determinative- of guilt or innocence.” Giglio, 405 U.S. at 154, 92 S.Ct. 763.
The first question, therefore, is whether Weéks’ subjective impression of Clemons’ condition is exculpatory evidence. The Master did not find that it was, and this plainly is correct. There is no logical or legal connection between ‘ Weeks’ subjective impressiori of Clemons’ appearance at 5:25 a.m. on April 8 and the role that Clemons did (or did not) play in the deaths i of Julie and Robin Kerry on the Chain of Rocks Bridge in the early morning hours of April 5.
Second, the Master did not find that Weeks’ evidence would have impeached Cummins or Winfrey, the only two witnesses at trial whose testimony clearly was “determinative of guilt or innocence.” Id. Nor did the Master find that Weeks’ evidence would have impeached the testimony of the two detectives- who testified at the suppression hearing and denied that they (or anyone else) abused Clemons at any- time, -This, too, is correct because Weeks admits that he has no idea how or if Clemons was -injured, let alone whether it resulted from the detectives beating him prior to 9:35 p.m. on April 7 (i.e., when Clemons claims the abuse ended) in an effort, to coerce Clemons into making a statement.
Instead, the Master concluded that Weeks’ subjective impression that Clemons’ face looked swollen was impeachment evidence — not for the detectives — but for ancillary witnesses (e.g.,- Sergeant Williams) who testified that Clemons’ cheek was not swollen in the hours and days after he gave the audiotaped statement. The Master is correct. It was the state’s burden at the suppression hearing to show that Clemons’ statement was voluntary, not Clemons’ burden to' show it was involuntary. The detectives’ testimony, if believed, is sufficient for the state to carry its burden.
Unlike the detectives’ testimony, testimony from Sergeant Williams (and others) that Clemons appeared uninjured in the hours and days after he gave his statement does not prove the statement was voluntary, even if believed. Instead, this evidence makes the detectives’ testimony more believable because it corroborates their testimony. By the same token, evidence'from Weeks (and others) that Clem *103 ons’ face was swollen in the hours and days after. Clemons made his statement does not prove that the statement was involuntary. Instead, it only easts doubt on the evidence from Sergeant Williams (and others) that corroborates the detectives’ testimony. Accordingly, the Master correctly . concluded that “testimony by Weeks is a method of impeachment” to cast doubt on the credibility of Sergeant Williams, Report, at 103.
Just because Weeks’ subjective impression of Clemons’ appearance is properly characterized as impeachment evidence, however, does not necessarily mean it is covered by Brady. As noted above, Giglio does not extend Brady to ¿very piece of evidence that might impeach any witness on any issue. Instead, Giglio extends Brady only to impeachment evidence when the “reliability of a given witness may well be determinative of guilt or innocence.” Giglio, 405 U.S. at 154, 92 S.Ct. 763 (emphasis added). See also Engel, 304 S.W.3d at 120 (undisclosed evidence would have impeached “chief prosecution witness”). Here, Sergeant Williams testified that he saw no. swelling on Clemons’ face on the afternoon of April 8. He is not a witness “who may well be determinative of guilt or innocence,” and neither were any of the other witnesses who saw no injury to Clemons’ face in the hours and days after his interrogation during the evening of April 7. Accordingly, Weeks’ evidence is not impeachment evidence for purposes of Brady. t
Suppression hearings protect important constitutional rights, usually under the Fourth, Fifth, and Sixth- amendments. But these proceedings do not determine guilt or innoeence. In fact, courts readily acknowledge that suppression often comes at the expense of determining these 'questions. This is why federal courts have been skeptical as to whether Brady even applies to evidence in suppression hearings.
The information was relevant to impeaching the officers’ explanation at the suppression hearing as to why they had probable cause to detain and arrest len-co, but the Seventh Circuit has never squarely held that Brady applies to suppression hearings. See United States v. Stott, 245 F.3d 890, 901-02 (7th Cir.2001). And, although lenco could have used the report to. impeach the defendants’ testimony regarding the arrest, such impeachment does not go to lenco’s guilt or innocence, and thus does not fall within the parameters of Brady, See Giglio, 405 U.S. at 154, 92 S.Ct. 763 (noting that when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within the Brady rule); see also Bagley, 473 U.S. at 677, 105 S.Ct. 3375. lenco simply failed to satisfy Brady’s materiality prong.
Ienco v. Angarone, 291 F.Supp.2d 755, 762 (N.D.Ill.2003) (emphasis added), aff'd, 429 F.3d 680 (7th Cir.2005). Another district court provided this overview of the issue:
Circuit courts have split on the issue whether Brady v. Maryland’s restrictions apply to suppression hearings, although it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court’s, conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea.
***
United States Court of Appeals for the District of Columbia has recognized that “it is hardly clear that the Brady line of Supreme Court cases applies to suppression hearings,” because “ [suppression hearings do not determine a defen *104 dant’s guilt or punishment, yet Brady rests on the idea that due process is violated w hen the withheld evidence is ‘material either to guilt or to punishment, United States v, Bowie, 198 F.3d 905, 912 (D.C.Cir. 1999).
United States v. Harmon, 871 F.Supp.2d 1125, 1151-52 (D.N.M.2012), aff'd, 742 F.3d 451 (10th Cir.2014) (emphasis added).
Even assuming that Brady extends to suppression hearings, however, or at leást to those suppression hearings in which the voluntariness of a defendant’s inculpatory statement is to be decided, Brady certainly does not extend further in a suppression hearing than it does at trial. Accordingly, Brady should only extend to evidence that tends to prove the statement was involuntary (i.e., the suppression hearing equivalent of exculpatory evidence regarding guilt or punishment) or to evidence that tends to impeach the credibility of a witness who “might well be determinative” of the voluntariness issue (i.e., the suppression hearing equivalent of impeachment evidence regarding a witness whose credibility “might well be determinative” of guilt or innocence). Weeks’ evidence does neither.
Weeks’ subjective'impression regarding Clemons’ appearance hours after his interrogation ended does not prove that detectives physically abused Clemons to make him give a statement. Nor does it impeach the detectives’ testimony in which they denied beating Clemons for that (or any other) purpose. Instead, the Master properly concluded that Weeks’ evidence serves only to impeach those witnesses like Sergeant Williams whose testimony, in turn, corroborates the detectives’ testimony. Accordingly, as with Clemons’ claim regarding the rape kit, Weeks’ evidence is not impeachment evidence for purposes of Brady and Giglio.
2. Sufficient “Cause” to Bring a Belated Brady Claim
Even if Brady applies to the' state’s failure to disclose evidence that merely impeaches the credibility of corroborating witnesses and not witnesses who might be determinative of whether Clemons’ statement was voluntary, or not, Clemons cannot raise a new Brady claim; where the undisclosed evidence was known — or, through the reasonable diligence of defense counsel, could have been known — to him earlier. This is the “cause” element of the “cause and prejudice’-’ gateway, and it requires “a showing that the factual or legal basis for a claim was not reasonably available to counsel or that some interference by officials made compliance impracticable;’’ Murray, 477 U.S. at 488, 106 S.Ct. 2639 (quotation marks and- citations omitted). See also Woodworth, 396 S.W.3d at 337 (same).
Just as the Master properly rejected Clemons’ Brady claim regarding the draft police report on the ground that Clemons’ counsel knew about the report and, with reasonable diligence, could have obtained it; Clemons’ Brady claim regarding Weeks also should fail; Months béfore trial, Clemons knew who Weeks was, he knew that Weeks had thought Clemons’ cheek was swollen at 5:25 a.m. on April 8, and he had in hand the PTR report that Weeks had prepared during that interview. Unfortunately, the Master never analyzed whether Clemons had shown sufficient “cause” to raise a new Brady claim regarding the Weeks' evidence.[9] If he had, he *105 would have had to conclude, as he did with the draft police report, that Clemons cannot profit now from information that he knew about long before trial and that his lawyers could have pursued (but did not pursue) more than 20 years ago.
Clemons ignores that the state disclosed Weeks’ name and the fact that he was doing PTR pre-interviews at 7th Street on the morning Clemons was booked. Instead, Clemons argues that the state failed to disclose that Clemons’ PTR report had been “altered” ’ (i.e., that the 'word “bruise” had been crossed out). That argument is baseless.
Clemons’ PTR report was produced to defense counsel in September 1992. If it had been altered before it was produced, defense counsel should have spotted the alteration and asked Clemons (and/or Weeks and/or Commissioner Edwards) about it then. On the other hand, if Clemons’ PTR report was altered añer it was disclosed to the defense, then the alteration is irrelevant because defense counsel’s copy of the document shows whatever it is that Weeks wrote on the report. Either way, because Clemons had all the information about the altered PTR report that the state had, 'this is the very antithesis of a Brady violation.
Clemons’ filial argument is that the state failed to disclose Weeks’ subjective impression that Clemons’ face looked swollen on the morning of April 8, 1991. This claim is the most absurd of all. Clemons knows that Weeks thought his face looked swollen because Weeks mentioned the apparent swelling to Clemons when the two were sitting face-to-face that morning of April 8, 1991. Accordingly, Clemons knew about Weeks’ subjective impression before anyone else (except Weeks, of course). Brady does not require the state to remind defendants of things other people told them. See State v. Salter, 250 S.W.3d 705, 714 (Mo. banc 2008) (under Brady, if “the defendant had, knowledge of the evidence at the time of trial, the State cannot be faulted for nondisclosure”) (emphasis added) (citations omitted); Kyles, 514 U.S. at 437, 115 S.Ct. 1555 (Brady applies only to evidence “unknown to the defense”) (emphasis added).[10]
*106 Even if Clemons did not remember the name of the PTR officer who remarked that Clemons’ faced looked swollen on the morning of April 8, Clemons certainly knows that someone in the. PTR office, made a remark to that effect. The state’s witness list disclosed that Weeks worked in that office, and the state also disclosed the sign-in sheet for 7th Street “holdover,” which shows that Weeks was on duty when Clemons was booked. If Clemons wanted to prove that he appeared injured after his interrogation ended, interviewing those with whom Clemons had contact — and especially those who told Clemons that his face looked swollen- — would have taken very little investigative insight and only slightly more effort.
Accordingly, Clemons failed to prove sufficient “cause” , for failing to bring a Brady claim concerning Weeks much earlier, assuming such a claim ever could have been made. Clemons has always known that Weeks thought Clemons’ cheek was swollen because Weeks told Clemons that he thought Clemons’ cheek looked swollen.[11] With the slightest effort — not to mention reasonable diligence — the defense could have identified Weeks as the person who made this remark, deposed him, and asked' him both about Clemons’ appearance and about what it is Weeks wrote on the PTR report that was later crossed out. See Coleman v. Mitchell, 268 F.3d 417, 438 (6th Cir.2001) (“‘the.Brady rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at igsue,’ such as when the evidence in question ‘would have been discoverable with minimal investigation by [defense] counsel’ ”) (emphasis added); United States v. Jones, 160 F.3d 473, 479-80 (8th Cir.1998) (“no Brady violation if ‘the defendants, using reasonable diligence, could have obtained the information’ themselves”) (quoting Westley v. Johnson, 83 F.3d 714, 726 (5th Cir,1996)) (emphasis added).

3. Weeks’ Evidence is NOT Material

Even if Clemons could show “cause,” and even if Clemons could show there was a “nondisclosure” for purposes of Brady (i.e., that the undisclosed evidence was either exculpatory on the issues of guilt or punishment or would impeach a witness whose testimony may be determinative of guilt or punishment), Clemons is not entitled to have his murder convictions and death sentences set aside because Weeks’ evidence was not “material.” As the Supreme Court recently reaffirmed:
evidence is “material” within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A reasonable probability does not mean that the *107 defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine[] confidence in the outcome of the trial.
Cain, 132 S.Ct. at 630 (citations and quotation marks omitted).
“Materiality” for purposes of Brady is the same as the prejudice element for claims of ineffective assistance of counsel under Strickland, and both of these are the same as the “prejudice” prong of “cause and prejudice.” Bagley, 473 U.S. at 682, 106 S.Ct. 3375. Under any of these tests, the inmate must show that, but for the nondisclosure (or ineffective assistance of counsel), there is a reasonable probability that the inmate would not have been convicted or received the sentence he did. Id, (citing Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).
As noted above, there is some doubt as to whether Brady even applies to evidence in a suppression hearing. Federal courts are unanimous, however, in holding that— if Brady does apply to suppression hearings — the inmate must show both-. (1) a reasonable probability that the undisclosed evidence would have altered the outcome of the suppression hearing; and (2) a reasonable probability that the suppression of the evidence would have altered the outcome of the trial on the question of guilt or punishment.
Had [the witness] ..testified, it seems highly unlikely that she would have affected the outcome of the suppression hearing, no less the trial. To make a difference.at the hearing, [her] testimony would have needed to overwhelm the State’s countervailing evidence; otherwise, it would not have convinced the judge to suppress McNary’s statements_ Further still, [the witness’s] statements could not have affected the outcome of the trial. To establish prejudice, [the defendant] would need to show not only “a reasonable probability that he would have prevailed on the motion to suppress” but also “a reasonable probability that ... he would have been acquitted.” Bynum v. Lemmon, 560 F.3d 678, 685 (7th Cir. 2009). Here, even if [the witness’s] testimony convinced the judge to suppress [the defendant’s] statements, the outcome of the . trial would not have changed.
McNary v. Lemke, 708 F.3d 905, 916-917 (7th Cir.2013) (emphasis added). See also Bynum v. Lemmon, 560 F.3d 678, 685 (7th Cir.2009) (inmate must “show that, had he testified, there was both a reasonable probability that he would have , prevailed on-the motion to suppress and a reasonable probability that, if his confessions were suppressed, he would have been acquitted”).
No court, state or federal, has granted relief where — as the Master found — the úndisclosed' evidence might have altered the result of a suppression hearing alone. In every case, the inmate also must show a reasonable probability that, if the topic of the suppression hearing had been excluded at trial, the jury’s verdicts would have been different. Nuckols v. Gibson, 233 F.3d 1261, 1267 (10th Cir.2000) (relief granted where state failed to disclose evidence showing the “key** witness in suppression hearing may have “had ¡a motive to goád [the inmate] into waiving his right to counsel during the interrogation and confessing to the crime and, if the inmate’s confession had been suppressed, there is a reasonable probability he would not have been convicted and sentenced to death”); White v. United States, 352 F.Supp.2d 684,. 688 (E.D.Va.2004) (“Petitioner cannot show that a suppression hearing would *108 have resulted in the suppression of any evidence that would [have] affected the outcome of Petitioner’s trial”).
Even if the state had produced to Clemons what he already knew (i.e., that Weeks thought Clemons’ face was swollen when they met on the morning of April 8, 1991), there is no reasonable probability that the trial judge would have suppressed Clemons’ audiotaped statement. And, even if the trial judge had suppressed Clemons’ statement, there is no reasonable probability that the jury’s verdicts on Clemons’ guilt and punishment would have been any different.

(a) Weeks’ Evidence Would Not Have Altered the Suppression Hearing

The Master did not find there was a reasonable probability that the disclosure of Weeks’ evidence would have resulted in Clemons’ audiotaped statement being suppressed. Instead, the Master found only that there was a reasonable probability that Weeks’ evidence “might have resulted” in a different outcome for the suppression-hearing. The difference is important because, while the latter finding is supported by the evidence, the former finding never would have been.
To assess what impact Weeks’ evidence might have had on the suppression hearing, the Court' must look at why the trial court overruled the motion to suppress and whether there is a reasonable probability that Weeks’ evidence would have altered that decision. In overruling Clemons’ motion to suppress, the trial court stated:
The basis for my ruling is there was not any credible evidence to show how [Clemons] got those injuries if, in fact, he got them. And that was other than the defendant’s testimony. And I applied the same ruling that we tell our jurors to use when assessing the credibility of a witness, and that was the basis for my ruling.
Clemons’ Trial Transcript at 1765.[12]
The trial court’s reference to the general jury instruction on judging witness credibility is instructive. See MAI CR 302.01. This instruction tells jurors to take into consideration, among other things, the witness’s manner while testifying, the reasonableness of the witness’s testimony considered in light of all the evidence in the , case, and whether the testimony may be influenced by the witness’s interest, bias, or prejudice.
*109 Here, demons’ interest and bias is obvious. As to his “manner,” Clemons’ own trial counsel testified in the post conviction proceeding, that Clemons’ demeanor on the stand during the suppression hearing was a key factor in determining not to recommend that he testify at trial. See Order Denying PCR, at 42-43. Finally, Clemons’ testimony that the detectives beat him continuously was not reasonable in light of the fact that the trial court found no “credible evidence to show how he got [his] injuries if, in fact, he got them.” In short, the trial court believed the detectives’ testimony denying- that 'they mistreated Clemons and did not believe Clemons’ testimony that they beat him into making the audiotaped statement. Therefore, there is no reasonable probability that the disclosure of Weeks’ evidence would have changed this ruling because the trial court made its decision on the basis of the officers’ and Clemons’ credibility, not on the strength (or weakness) of the corroborating witnesses such as Sérgeant Williams.
The trial court overruled the motion to suppress based on the credibility and demeanor of Clemons and the two detectives; Weeks’ evidence sheds no light on this. The trial court overruled the motion based on Clemons’ obvious bias and motive to lie; Weeks’ evidence sheds no light ■ on this either. The only issue on which Weeks’ evidence is relevant-is whether the detectives’ testimony was reasonable — and Clemons’ was unreasonable — in light of the “other evidence.” In order to assess — on the one hand — the corroborating witnesses whose testimony supports the detectives’ testimony and — on the other hand — the witnesses whose testimony impeaches the corroborating witnesses’ evidence, the following is a recap all of the evidence before the Master regarding who saw Clemons, when, and what they saw:
Sunday, April 7,1999
9:35 p.m. Clemons begins audiotaped statement to Detectives Pappas and Brauer in the Homicide Division
10:13 p.m. Clemons’ audiotaped statement ends
Detectives Pappas and Brauer say they did not assault Clemons and that he was unharmed and unmarked when the interview ended
10:15 p.m. Clemons held in Homicide Division interrogation room until taken to men’s “holdover” in Prisoner Processing Division (“PPD”)
Monday, April 8,1991
2:15 a.m. Detective Brauer delivered Clemons to men’s holdover, in PPD to await booking
2:28 a.m, PPD Processing Clerk Joyce Taylor prepared Clemons’ arrest register
Taylor saw no injuries to Clemons’ face and did not hear Clemons complain about being injured or assaulted by anyone in PPD
Watch Commander Darla Gray was present when Clemons was booked; she saw no injuries to Clemons’ face, and Clemons did not complain about being injured or assaulted by anyone
2:39 a.m. Clemons returned to men’s holdover
2:40 a.m. Clemons taken to Identification Unit, where Fingerprint Processor Phil Waller fingerprinted Clemons and took the booking photos [13] showing no injury on his face *110 Waller saw no injuries to Clemons’ face, and Clemons did not complain about being injured or assaulted by anyone
5:25 a.m. Probation Officer Warren Weeks, assigned to the Pre-Trial Release Commissioner’s Office (which uses space in the PPD), interviewed Clemons
Weeks saw a swelling on demon s’ right cheek that was “between a golf ball and a baseball” in size
Weeks asked Clemons about the swelling, but he did not respond
Weeks did not hear Clemons complain about being injuréd or abused by anyone, and Clemons said he had “No Problems” when Weeks asked him about his physical condition
5:42 a.m. Pre-Trial Release Commissioner Yvonne Edwards interviewed Clemons
Edwards saw no injuries to Clemons’ face and did not hear Clemons complain about being injured or assaulted by anyone
6:58 a.m. Gray'was delivered to men’s holdover from the Homicide Division [14]
2:10 p.m. Detective Sergeant Warren Williams interviewed Clemons in men’s holdover
Sgt. Williams did not see any’injuries to Clemons’ face and did not hear Clemons complain. that he had been injured or assaulted by anyone
2:15 p,m. Michael Kelly, Clemons’ attorney, interviewed Clemons in men’s holdover
Kelly noted the fight side of Clemons’ face was swollen, that he had an abrasion on that cheek, an abrasion on his lip, and bruises on his chest
Afternoon Pre-Trial Commissioner Victor Kelíy met with Clemons (and Gray) to tell them they were not eligible for automatic bond or release
Commissioner Kelly saw no injuries on either prisoner’s face and heard neither Clemons nor Gray complain about being injured or assaulted by anyone
5:35 p.m. Watch Commander Sergeant Steven Mueller conducted a cell inspection in men’s holdover
Though Mueller had no reason to note Clemons (or Gray) specifically, he observed no injuries to any prisoner and received no complaints from any prisoner about being injured or assaulted by anyone
7 to 8 p.m. Veronda Brown, Clemons’ sister, noted that the. light side of Clemons’ face was “lopsided” and swollen
Brown heard Clemons say he had been “beaten,” but he did not say who had beaten him or. why, and Clemons did not claim police detectives had beaten him to make him give a statement
Tuesday, April 9,1991
*111 7:30 a.m. Deputy Sheriff John Tyra transported Clemons and Gray from men’s holdover to the criminal courts building for appearance
8:00 a.m. to noon In the holding pens at the'criminal courts building, prisoner Michael Kent saw (but did not speak to) Clemons
Kent observed that Clemons’ lip was swollen but did not observe any swelling to Clemons’ cheek or eye and did riot hear Clemons complain about being injured or assáulted by anyone.
Morning Vera Thomas, Clemons’ moth-, er, saw Clemons at his court appearance and observed that Clemons’ jaw was swollen and “sticking out” . . .
Morning Reynold Thomas, Clemons’ stepfather, saw Clemons at his court appearance and observed Clemons’ right cheek was swollen
Morning Donald Robinson, Clemons’ cousin, saw Clemons at his court appearance and observed Clemons’ right eye was “swollen shut”
Morning Michael Kelly, Clemons’ attorney, saw Clemons at his court appearance and observed that Clemons’ injuries were not as evident as they had been the previous afternoon, but noted Clemons’ right cheek was still “slightly swollen”
Noon Deputy Sheriff John Tyra trans- . ported Clemons and Gray to the City Jail
Afternoon While being processed into the city jail, Clemons told Lorenzo Chancelor, correctional counselor, that his (Clemons’) right cheek was swollen Chancelor noted this on Clemons’ intake forms, which he testified he would not have done had he not seen it
1:30 p.m. Julian Boyd, Superintendent of the St. Louis City Jail, notified St. Louis Police Department Internal Affairs that Clemons and Gray wanted to file complaints of physical abuse by police detectives
After. 1:30 p.m. Internal Affairs Sergeants Huelsmann and Svriderski interviewed Clemons briefly at the city jail
Neither Internal Affairs officer saw any visible signs of injury to Clemons’ face
Even though Clemons complained of a “cut” inside his mouth, Huelsmann .and Swiderski could find nothing but a small-hole (l/16th of an inch) on the inside of Clemons’ lower lip
Clemons was again photographed[15] to document his condition at this time
7:50 p.m. Dr. Duntley, an emergency room physician, examined Clemons at Regional Medical Center[16] *112 Duntley saw evidence of “mild facial trauma” (i.e., “mild swelling” on the right cheek), which Duntley characterized as “not impressive”
Duntley opined that Clemons’ injuries might have been caused by a blow or other contact with a hard surface and could have been self-inflicted Duntley found no swelling around Clemons’ eye and testified it certainly was not “swollen shut”
Duntley found no significant injury to Clemons’ lip and concluded, if there had been a laceration at all, it must have been “minute”
Clemons did not complain to Duntley of any pain or tenderness in his chest or scalp, and Duntley opined that anyone who had been struck there repeatedly within the preceding 10 to 15 hours would be tender and bruised if the blows were even “moderately hard”
Duntley testified that he saw no swelling or any significant bruising on the right side of Clemons’ face in the booking photographs from 2:40 a.m. on April 8 or the photographs taken by Sgts. Huelsmann and Swiderski on the afternoon of April 9
As the Master noted, the state’s burden in a suppression hearing is relatively low, i.e., the state need only show that it is more likely than not that the statement was voluntary. It is conceivable that, in a suppression hearing stand-off between police and a defendant, evidence that would impeach the evidence that corroborates idle police’s version could be “material” for Brady purposes. But not here. Just as Kelly’s evidence that Clemons’ face was swollen is offset by Williams (who saw Clemons immediately before Kelly), Weeks’ evidence that Clemons’ face was swollen is offset by Edwards (who saw Clemons immediately after Weeks).[17] Standing alone in this mass of conflicting recollections are the photographs of Clemons taken at 2:40 a.m. on April 8 and on the afternoon of April 9, none of which show any sign of the golf ball-sized or baseball-sized swelling described by Weeks or the entirely different (but equally gruesome) injuries described later by Kelly and Clemons’ family. Ultimately, just as it did 20 years ago, the issue comes down to credibility.
Accordingly, if the trial court had heard Weeks’ evidence in the context of all the evidence as set forth above, it cannot be said there is a reasonable probability that Weeks’ evidence “would have resulted” in the trial court suppressing Clemons’ statement. United States v. Sipe, 388 F.3d 471, 478 (5th Cir.2004) (“when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material”).
Even on the first step of the materiality analysis, Clemons does not have to prove that the trial court would have overruled the motion to suppress, Kyles, 514 U.S. at *113 434, 115 S.Ct. 1555, but he nevertheless must show a “reasonable probability” that this would have occurred. It cannot go without notice, or be dismissed as merely a slip of the rhetorical tongue, that the Master did not conclude there was a reasonable probability that Weeks’ evidence “would have resulted” in the trial court suppressing Clemons’ statement. Instead, the Master concluded only that Weeks’ evidence “might have resulted” in that outcome. The two are very different.
Without a doubt, [the undisclosed evidence] might have changed-the outcome of the trial. That, however, is not the standard that petitioner must satisfy in order to obtain relief. He must convince us that “there is a reasonable probability” that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.
Strickler, 527 U.S. at 289, 119 S.Ct. 1986 (emphasis added).
Accordingly, the Master did not find that Clemons satisfied the first step of the materiality element, i.e., that there was a reasonable probability the trial court would have suppressed - his audiotaped statement if the Weeks evid’ence had been disclosed.

(b) Suppression of Clemons’ Audiotaped Statement Would Not Have Altered the Jury’s Verdicts

The analysis now arrives where it began: If the trial court had suppressed Clemons’ audiotaped statement, has Clemons shown a reasonable probability that the jury’s verdicts on guilt or punishment would have been different? This is the question that the Master thought Kyles did not allow him to answer. Then, the Master answered it anyway. Stating frankly that the idea of giving Clemons relief was “troubling,” the Master stated:
“I am dubious that the suppression of Clemons’ statement would have - made much difference in this case, due to the strength of the evidence....” Report at 104.
Kyles is not the roadblock to common sense that the Master thought (or‘ was told) it is. There, Justice Souter traced the state’s due process disclosure obligation from Brady to United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), to Bagley, 473 U.S. at 667, 105 S.Ct. 3375. Kyles, 514 U.S. at 432-34, 115 S.Ct. 1555. In the last of these, Bagley, the Court adopted the same standard for, materiality for “nondisclosure” under Brady as it adopted for “ineffective assistance of counsel” claims under Strickland, i.e., that — if the state had disclosed the withheld evidence — there is a reasonable probability the jury would not have convicted the defendant or, if convicted, would have recommended a lesser punishment. Bagley, 473 U.S. at 682, 685, 105 S.Ct. 3375.
Kyles, however, makes several points about this holding in Bagley. First, Kyles points out that the inmate only needs to show a “reasonable probability” of a different outcome, not that a different outcome “is more likely than not.” Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Second, Kyles explains that “a reasonable probability” can exist even though the state’s case remains constitutionally sufficient to support the inmate’s coiiviction and sentence. Id. And, Kyles explains that a series of nondisclo-sures by the state taken together may create a reasonable probability of a different outcome even though no single piece of undisclosed evidence — viewed . in isolation — would meet this “materiality” threshold. Id. at 436-38, 115 S.Ct. 1555.
The comment in Kyles that sidetracked the Master’s analysis, however, is this: “[O]nce a reviewing court applying Bagley *114 has found constitutional error there is no need for further harmless-error review.” Kyles, 514 U.S. at 435, 115 S.Ct. 1555. There is nothing remarkable about this statement but, presented to the Master out of context, he took it to mean that a Brady violation merits relief.even if the undisclosed evidence would not. have had any impact on the trial. That is the opposite of what Kyles holds.
Kyles explains that, under Bagley, a defendant must show that the state’s nondisclosure was “material” (or “harmful”) in order to establish a Brady claim. Once that is accomplished, it is logically impossible for the court to-declare that' same nondisclosure to be “harmless.” As a result, Kyles notes that — even if “a harmless-érror enquiry were to apply” — a “material” nondisclosure under Bagley cannot be a “harmless error’* because the defendant has already shown “a' reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Id. at 435, 115 S.Ct. 1555.[18] See, e.g., Jalowiec v. Bradshaw, 657 F.3d 293, 306-07 (6th Cir. 2011) (explaining that Kyles not only does not prohibit the court from deciding whether other evidence of guilt was overwhelming, Kyles requires such an analysis).
Not only does Kyles not prohibit examining the impact of the undisclosed evidence in light of the unaffected aspects of the evidence against the inmate, it is universally recognized that “a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.” Strickland, 466 U.S. at 695-96, 104 S.Ct. 2052, In one of the most recent Brady decisions, the Supreme Court noted: “We have observed that evidence impeaching an eyewitness may not be material if the State’s other evidence is strong enough to sustain confidence in the verdict.”. Cain, 132 S.Ct. at 630 (emphasis added) (citing Agurs, 427 U.S. at 112-113 and n.21, 96 S.Ct. 2392).[19]
*115 Not only is this principle firmly established in Supreme Court decisions before and after Kyles,[20] but it is evident in Kyles as well. Following the brief reference to whether a “material” nondisclosure can also be "harmless,” Kyles devotes most of its remaining pages (and all of the dissenting opinion) to a debate over whether the state’s case against Kyles was too overwhelming for the undisclosed evidence to have made any difference.
In assessing the significance of the evidence withheld, one must of course bear in mind that not every item of the State’s case would have been directly undercut if the Brady evidence had been disclosed. It is significant, however, that the physical evidence remaining unscathed would, by the State’s own admission, hardly have amounted to overwhelming proof that Kyles was the murderer.
* * *
Perhaps, confidence that the verdict would have been the saihe could survive the evidence impeaching even ’two eyewitnesses if the discoveries of gun and purse were above suspicion. Perhaps those suspicious circumstances would not defeat confidence in the verdict if the eyewitnesses had generally agreed on a description and were free of impeachment. But ... [not when the] evidence would have entitíed a jury, to find that the eyewitnesses were not consistent in describing the killer, that two out of the four eyewitnesses-testifying were unreliable, that the most damning physical evidence was. subject to suspicion^ that the investigation, that produced it was insufficiently probing, and that the principal police witness was insufficiently informed or candid.. This is not the “massive” case envisioned by the dis-sentf.]
Kyles, 514 U.S. at 451, 454, 115 S.Ct. 1555 (emphasis added).
*116 Accordingly, not only was the Master not prohibited from assessing what impact suppressing Clemons’ audiotaped • statement would have had in light of the state’s other evidence, the Master was obligated to do'-so.
As set out above, Clemons first argues there is a reasonable probability Weeks’ evidence would have resulted in the trial court suppressing his audiotaped statement; the Master never (quite) agreed.[21] The second step of Clemons’ argument asserts, as Kyles explains he must, that — if his statement had been suppressed — the jury'would not have convicted him of the murders' of Julie and Robin Kerry or recommended the death penalty for those crimes. In his brief to this Court, Clemons argues that his statement was “the lynchpin to the State’s evidence of deliberation and the Only piece of testimonial evidence heard at trial placing Clemons on the platform beneath the bridge deck during the murders.” The Master knew this assertion is incorrect, and — with typical thoroughness — dismantled it piece by piece:
Clemons ... says the evidence against him was weak, especially if the confession is out of the picture. In that regard, he says the confession was the only evidence he was under the Bridge.
[[Image here]]
So far as the strength of the evidence is concerned, recall that this Court found that the evidence of Clemons’ deliberation was “substantial, compelling, and without doubt.” Ibid, at 217. At the habeas hearing, Clemons asserted his privilege against self-incrimination when asked about whether he did the following: raped the Kerry sisters; assisted in raping them; put one of them down the manhole by himself; put Tom Cummins down the manhole; went down onto the platform with Richardson, after the sisters and Cummins were on the steel platform; along with Richardson, forced the three to get on the concrete pier; and told Marlin Gray and Daniel Winfrey, “We threw them off the bridge.” (H.C.T. 383-388.) I infer from this testimony that Clemons refused to answer those questions because the answers would have further solidified his complicity in the murders and *117 rapes of the Kerry sisters on April 5, 1991. ■ ■
That conclusion is bolstered by the damning testimony adduced in three different murder trials. After Thomas Cummins was force.d to lie facedown on the steel platform, he heard two sets of footsteps land, as if two people jumped down there. He assumed that there were two people down there with the group of cousins. (Richardson T. 1599-1600) We know,from Winfrey’s testimony that he and Gray were off the Bridge, which leaves Richardson and Clemons as the two men who jumped down onto the platform. The man who seemed to be in charge was Clemons. (Richardson T. 1587) One of the two apparently raped Robin Kerry on the platform as Cummins and Julie lay next to her. (Ex. 236 at 53-54) After they were told to get on the pier, Cummins heard a voicé say, “Don’t look at us,” (Ex. 236 at 57; Richardson T. 1641)
Were there two assailants on the platform below the deck of the Bridge? Why would there be only one? With Gray and Winfrey off the Bridge, why would the guy in charge [Clemons] put one 140 pound 16 year old with an IQ of 70 [Richardson] alone with three people, one ’of whom [Cummins] was a male who outweighed Richardson by 70 pounds? Why would Clemons or Richardson rape Robin Kerry on the platform unless someone was watching his back while he perpetrated his crime? And we know that Cummins heard two people jump down onto the steel platform. Consider what did Clemons told Gray as he and - Richardson ran off the Bridge: “We threw them off the bridge.” (Gray T. 1694, 1745; T. 2049, emphasis added) Later, after the group of four went to the Chair in Alton tó contémplate their evening’s activities, Clemons explained to Gray that he told the victims “that he was going to kill them.” (Gray T. 1700) Why did Clemons tell the young women he was going to kill them, and later announce that he and Richardson had thrown them off the Bridge, unless he had involvement in their murders?
Report at 104-05 (emphasis added).
Clemons ignores the Master’s analysis and, instead, asserts that his audiotaped statement played a key role in the jury’s verdicts finding him guilty of these two murders and recommending the death penalty. To support that assertion,. Clemons points to the jury’s request for his statement during its deliberations. Not only is this a gross distortion of the record, but even a cursory look at what actually happened refutes Clemons’ theory.
Shortly after the jury retired, they, sent a note requesting the following: “All photographs, tape recorded tapes (audio), statements of Winfrey, Cummins, Clemons.” Far from singling Clemons’ statement out as important; the request simply included that statement in a comprehensive list of all the exhibits the jury wanted to have with them during their deliberations. What the jury received matters far more, however, than what they asked for. The trial court did pot allow the jury to have Clemons’ audiotaped statement — or the transcript of that recording — in the jury room. Instead, the jury was called back into the courtroom and allowed to hear Clemons’ statement one additional time (following along with the transcript if they wanted to). But they were not allowed to discuss the tape amongst themselves until they handed the transcript back to the bailiff and returned to the jury room.
Clemons is right that the evidence the jury had with them in the jury room could have been given great weight; he is only wrong about what evidence that was. The *118 jurors never had the tape or transcript of Clemons’ statement with them, but they did have Winfrey’s statement (which Winfrey made in the presence of his parents and a juvenile officer) and both of the transcripts of Cummins’ taped statements to the police on the morning of April 5, 1991. Those transcripts are 72 and 54 pages long, and they recount in torrid detail — twice—Cummins' account of what happened on the bridge only hours before.[22] The following is an overview of what the jury would have gleaned from these transcripts:
• Gray told Cummins: “Man,'this is not your lucky day. You’re in trouble. Big trouble.” Throughout the attack, while Julie and Robin Kerry were being raped, Cummins said “people kept sayin’ stuff about — uh—We’re gonna kill you.’ We’re gonna shoot you.’ Or ‘You are gonna die tonight.’” Gray told Cummins he had a gun and he would shoot Cummins if he looked anywhere but down.
• Cummins heard Julie and Rdbin screaming “Stop. Leave me alone.” He heard Richardson or Clemons tell Julie, “You stupid bitch, do you want to die? I’ll throw you over right now. Do you want to die?” When Julie said no, he told her to take off 'her pants and started counting to three. After that, Cummins could hear Julie sobbing and' could not hear Robin at all.
• Clemons told Cummins, “I ain’t never had the pleasure of poppin’ somebody.” In the course of taking Cum-mins’ money and watch, Clemons found a badge in Cummins’ wallet. He demanded Cummins tell him what the badge was for, and Cummins said he was a firefighter.
• Later, Clemons told Cummins he was a “rich fat boy” and was going to die. “He kept askin’ me, ‘Do you want to die? Do you want to die?’ and I said, No, I don’t want to die. I want to stay alive.” When Winfrey told Cummins he would let him live, Clemons and Winfrey began to argue about whether Cummins should live or die. Finally, Clemons said “I fucked your girl. How does that make you feel?” He then made Cummins walk over and sit down on the edge of the manhole leading below the bridge deck to the platform and bridge pier below.
• When Cummins dropped down to the platform, he could see Julie and Robin lying there naked. He said: “And they told me to get down and lay next to them on the left.... I could feel Robin being pushed back and forth and I heard Julie say, ‘Just relax, Robin. It’ll all be over soon.’ ” When the police asked if Cummins thought one of them was having sex with Robin, he said yes. “Uh — after three or four minutes were gone — uh—they told me to get up at this time and move to my left — -uh—and step down on to the concrete pier.”
• When the police asked if Cummins could tell whether the assailants were on the platform below the bridge deck, Cummins said, ‘Yes, some — two people* — I—I distinctly heard two sets of .feet drop on this metal [platform].”
• After the Kerry sisters were made to join Cummins on the pier, Robin started clutching Cummins’ arm. Cum- *119 mins then heard one of the two say, “Stop touching each other” and “Don’t touch each other or look at us.”
• Moments later, someone pushed Julie and Robin off the pier and into the river below. Cummins • looked; "and saw it was Richardson. Cummins could hear Julie and Robin scream throughout their fall, and could hear them hit the water. Richardson then told Cummins to jump and, believing he would be killed, Cummins did.
The copy of Winfrey’s statement that the jury had during deliberations, though shorter, is no less damning. More importantly, it corroborates Cummins’ story almost perfectly:
• that the four were leaving the bridge when Clemons suggested' going back to Julie and Robin Kerry, whom they had met on the bridge, and that Gray agreed because he said he felt “like hurting somebody;”
• that Gray handed Winfrey a condom on the walk back toward the victims, . which Winfrey believed Gray had gotten from Clemons;,
• that, when Winfrey said he would not rape anyone, Clemons shoved him toward the edge of the bridge and said, ‘You’re going to do [it];”
• that Winfrey and Gray initially restrained Cummins while Clemons and Richardson attacked the other two victims;
• that Clemons shoved Robin towards Winfrey, who then laid her on the deck;
• that Winfrey saw Clemons rip Julie’s clothes off and rape her while Richardson held her down;
• that Winfrey saw Clemons hold Julie down while Richardson raped her;
• that Winfrey restrained Cummins while Gray and Clemons took turns raping Robin;
• that Winfrey watched Richardson take Julie down through the manhole and onto the platform;
• that, when the rapes were finished, ■ Winfrey watched Gray- walk toward the Missouri end of the bridge;
• that Winfrey saw Clemons put Robin through the manhole down to the platform;
• that Winfrey saw Clemons, after find*ing a badge in Cummins’ wallet, ask Cummins if’he was a cop;
• that Winfrey saw Clemons drag Cum-mins to the manhole áñd put him 'through to the platform;
• that, when Winfrey told Clemons Gray had left the bridge, Clemons told Winfrey, “Hurry up, and go get him;”
• that, as Winfrey and Gray were heading back onto the bridge, they met Clemons and Richardson running off and Clemons said, “Let’s go. Let’s go, we threw them off.”
Both Winfrey and Cummins — Clemons’ accomplice and victim — testified about what happened on the bridge. If there was a “lynchpin” to the case against Clemons, it was the evidence provided by Winfrey and Cummins. Clemons’ statement merely corroborates that evidence. More importantly, unlike Clemons’ audiotaped statement, the jury was permitted — -without objection from Clemons — to study Winfrey’s written statement and Cummins’ two transcripts in the jury room during deliberations. There simply is no reason to believe that Clemons’ statement played as significant a role in the jury’s deliberations as Winfrey’s handwritten statement and the 120 pages of Cummins’ statements made only hours after the events. That evidence, and the remainder of the state’s case, was not “merely sufficient” to sup *120 port Clemons’ convictions and death sentences, it was overwhelming. Accordingly, there is no reasonable probability that— had Clemons’ statement been suppressed — the jury’s verdicts would have been different.
The more troubling aspect about Clemons’ argument is that it continues to ignore the instructions given to the jury regarding first-degree murder and accomplice liability. There is nothing new about Clemons’ claim that he should not have been convicted or sentenced to death because it was Richardson — not he — -who pushed Julie and Robin Kerry to their deaths. That is what he told the detectives in his audio-taped statement, that is what he argued to the jury based on his statement, that is what Clemons argued in this Court on appeal, and that is what he has argued in every other post conviction court for the past 20 years.
Now Clemons argues that it is reasonably probable the jury would not have convicted him and recommended he be sentenced to death if they had not heard him say that Richardson did it and that he (Clemons) played no part in their deaths. That lacks the force of logic. Given that the jury reached its verdicts despite hearing Clemons tell the detectives that it was Richardson who pushed the girls off the bridge and he (Clemons) had nothing to do with it, it is not even possible (let alone reasonably probable) that they would have reached the opposite conclusion if they had not heard Clemons’ denials and explanation at all.
Clemons’ defense at trial was that he cannot be guilty if he did not actually push the victims off the bridge. Now he seems to be arguing that he cannot be guilty if he did not see Richardson push them. Both theories are inconsistent with the jury instructions that make it clear it did not matter who pushed whom or who saw what, as long as-the jury concluded beyond a reasonable doubt that either Clemons or Richardson intentionally and with cool deliberation killed Julie and Robin Kerry, and that Clemons coolly deliberated on that act. The jury followed those instructions and, as this Court held 17 years ago, there was “ample evidence of statements or conduct by the defendant or in the defendant’s presence indicating a purpose to kill.” Clemons, 946 S.W.2d at 216 (emphasis added).
When the plan was first conceived, Marlin Gray announced that he “felt like hurting someone.” While the rapes were occurring, someone — by inference either [Clemons] or Antonio Richardson — said to Julie Kerry: “You stupid bitch, do you want to die? I’ll throw you off the bridge if you don’t stop fighting.”[23]
[Clemons] threw the sisters’ clothes off of the bridge. After the rapes, first Richardson and then [Clemons] each put one of the Kerry sisters through the manhole to the platform below the bridge deck, from which the sisters were pushed to their deaths. [Clemons] then returned to the bridge deck where, after robbing Cummins, he discussed with Winfrey whether Cummins should live or die. Gray or Richardson could not have taken part in this discussion because Richards on was under the bridge and Gray had already started to walk off the bridge. Someone told Cummins that he had never had the pleasure of “popping” someone before. If [Clemons] did not say this, it was said in his presence.
*121 [Clemons] then took Cummins and moved him next to the manhole, ordering him to lie down. Someone — either [Clemons] or Winfrey — said, “You’re going to die,” after which [Clemons] put Cummins into the manhole, before sending Winfrey to look for Gray and following Cummins through the' manhole to the platform beneath the bridge himself. Once underneath the bridge, either [Clemons] or Richardson pushed the Kerry sisters from the bridge and ordered Cummins to jump into the river. Afterward, [Clemons] bragged, “We threw them off
Statements made by [Clemons] or in his presence indicated an intention to kill. [Clemons] continued to play an active role in the death-producing events, even after it became abundantly clear that the victims would be killed. The evidence of deliberation in this case is substantial, compelling, and without doubt. The trial court did not err in submitting the charges of first degree murder to the jury.
Id. at 216-17 (emphasis added). All of this evidence comes from Winfrey and Cummins. None of it comes solely from Clemons’ audiotaped statement. At most, Clemons’ statement corroborates some, but by no means all, of the evidence supplied by Winfrey and Cummins.[24]
This Court did not need to look far to find precedent for the holding that Clemons could be guilty of first-degree murder even though he did not actually push the victims off the' bridge or watch someone else do the pushing. Shortly before deciding Clemons’ appeal, this Court affirmed Gray’s first-degree murder convictions (and death sentences) even though the evidence was undisputed that Gray was oft the bridge completely before the Kerrys were pushed to their deaths. Clemons, 946 S.W.2d at 216 (citing State v. Gray, 887 S.W.2d 369, 376-77 (Mo. banc 1994), for the proposition that an accomplice can be guilty of first-degree murder when statements or conduct by the defendant, or by a codefendant in the presence of defendant, prior to the murder indicated a purpose to kill someone or when the defendant- continued in a criminal enterprise after it beeame apparent that a victim was to be killed). If Gray can be convicted and sentenced to death for these murders when he was not even on the bridge during the murders, there is no reason to lack confidence in the jury’s verdicts concerning Clemons merely because he claims (wrongly) that his audiotaped statement is the only evidence that he. was underneath the bridge when the Kerrys were murdered. Cummins’ testimony and transcribed statements, and even inferences from Winfrey’s testimony and handwritten statement, provide an ample basis for the jury to conclude that he was there. More importantly, the jury instructions and Gray’s convictions demonstrate that Clemons’ guilt is based on a long chain of culpable conduct — not merely that one link.
It is also worth noticing that Clemons’ argument conveniently ignores the other two statements he' made that the jury heard and that are entirely unaffected by Weeks’ evidence. First, Clemons was sitting with others watching television at a friend’s house when a story about the Chain of Rocks Bridge murders aired. In voices loud enough to be heard by all, both Clemons and Gray remarked: “I did that.” Clemons made the.second statement when Officer Williams came to visit him in men’s *122 holdover on the afternoon of April 8. Williams testified:
And [Clemons] stated to me that he had been delivering some pizza up in the Chain of Rocks area and that it was some friends of his and he had gotten drunk. And that, that he had just got with the wrong people, and that they had raped two girls; and that the other boy had made a statement to him that one of these girls was not going to identify him; and he pushed them into the water. And he said, “then we all left the area, and I left my flashlight.”
Tr. 3141 (emphasis added).[25]
The argument that, without Clemons’ audiotaped statement, the case against him was wéak and — like Richardson — might not have convinced the jury that he should be sentenced to death is deeply' flawed. This argument ignores the fact that Gray’s jury found his culpability warranted the death penalty despite his lack of proximity to the victims at the time they' were thrown to their deaths. This argument also ignores that, even ignoring his audio-taped statement, Clemons made two directly inculpatory remarks that Richardson did not: “We threw them off [the bridge]” and “I did that.” Finally, this argument ignores the fact Richardson admitted his complicity and conceded his guilt to rape.while Clemons insisted that he was not present and that Cummins was solely to blame.for the girls’ deaths.
The Master pointed out the irony of Clemons relying (in 2013) on not-so-new evidence to prove detectives assaulted Cummins to make him confess, when Clemons relied (in 1993) on those same detectives’ testimony that they never laid a finger on Cummins. An even more bitter irony arises out of Clemons arguing (in 2013) .that his audiotaped statement was the “lynchpin” .of the state’s case against him, when his counsel argued to the jury (in 1993) .that this same statement proved he was not guilty because it proved that Richardson (not he) pushed Julie and Robin Kerry from the bridge. The instructions for accomplice liability and first-degree murder explained to the jury that the questions of Clemons’ location on or under the bridge and whether he did (or did not) personally shove Julie or Robin Kerry off the bridge were not dispositive.
The Master heard the evidence presented, and personally reviewed the transcripts from the trials of Clemons, Richardson and Gray, as well as Clemons’ post conviction proceedings in state and federal courts. After assimilating all that information, he concluded: “I am dubious that the suppression of Clemons’ statement would have made much difference in this case, due to the strength of the evidence” against him. Report at 104. In Brady terminology, this means Weeks’ evidence was not “material” because, even if there is a reasonable probability that it would have resulted in Clemons’ statement being suppressed, there is no reasoiiable probability that' the suppression of Clemons’ statement would have resulted in any change to the jury’s verdicts on guilt or punishment. That is the question that *123 Gain and numerous other cases say must be answered, and .the Master’s answer is plainly correct and amply supported by the record.

TV. Conclusion

I do not know whether Clemons was beaten to compel him to give the equivocal, barely inculpatory, audiotaped statement. He claims the officers beat him; they deny his claims. Other witnesses (including Weeks) say they saw injuries to Clemons’ face at various times in the hours and days after his interrogation; still others say they saw no such injuries. But all of these witnesses {including Weeks) admit they have no personal knowledge of what caused Clemons’ injuries (if. any), and they all admit they did not observe any officer strike Clemons at any time or for any reason. Finally, there were no medical records supporting Clemons’ claim, and neither the photographs taken four and a half hours after Clemons’ interrogation nor those taken 36 hours later show signs of any such injuries.
But it is not this Court’s job to decide whether Clemons was beaten. The trial judge — and only that judge — was responsible for weighing the conflicting direct evidence- (i.e., testimony from Clemons and the officers) and the conflicting circumstantial evidence (i.e., the photos and testimony of all those who saw Clemons at various times after his interrogation) to determine whether Clemons’ statement was voluntary. That process resulted in a finding that Clemons’ motion to suppress must be denied because the state, proved it was more likely than not that Clemons’ statement was voluntary.
- Would the trial judge have reached .this same conclusion if he had heard Weeks! testimony? The Master-said Weeks’ story “may have” changed- the outcome of the suppression hearing. I do not- agree. Because the trial court believed the officers and did not believe Clemons, there is no likelihood that the trial court would have béen swayed by another in a long line of contradictory witness who sáw (or did not see) injuries on Clemons’ face hours and days later but had no ’direct knowledge about how such injuries (if any) were caused.[26]
Even if Weeks’ testimony would have caused the-trial judge to suppress Clemons’ audiotaped statement, Clemons should not be given relief because there is no reasonable probability that — without Clemons’ statement — the jury would not have convicted him or sentenced him to death. The Master was “dubious” that the exclusion of Clemons’ státemént would have made any such difference due to the weight of the other evidence against Clemons. I agree.
Clemons’ audiotaped statement aside, the evidence supporting Clemons’ convictions and sentences is overwhelming. The Supreme Court has declared repeatedly that, a Brady, claim cannot succeed under such circumstances. See Gain, 132 S.Ct. at 630 (“Evidence impeaching an eyewitness may not be material if the State’s other evidence is strong enough to sustain confidence in the verdict.”); Cone, 566 U.S. at 474, 129 S.Ct. 1769 (given the State’s overwhelming evidence, any “likelihood that the suppressed [Brady] evidence *124 would have affected the jury’s verdict on the issue of insanity is therefore remote”); Strickler, 527 U.S. at 294, 119 S.Ct. 1936 (Brady evidence impeaching eyewitness was not material in light of overwhelming evidence of guilt); Kyles, 514 U.S. at 451, 115 S.Gt. 1555 (state concedes remaining evidence of guilt would “hardly have amounted to overwhelming proof that Kyles was the murderer”). Here, the evidence showed that Clemons was the leader of the group that fell upon Julie and Robin Kerry and Thomas Cummins on the Chain of Rocks Bridge more than a generation ago. Clemons threatened to kill them and/or stood by his accomplices as they made the same threats. Clemons shoved Cummins and the two girls down onto the deck below the roadbed of the bridge and/or watched as others did so. • Finally, even if ■ Clemons did not push these two young women to their deaths, Clemons’ statement to Officer Williams admits that he knew his accomplice was going to do so and admits, further, that Clemons watched (and/or listened) while that occurred.
It is far too late for Clemons to be splitting such irrelevant hairs as where he was standing when the murders occurred. The Master expressly found that there was compelling evidence putting Clemons on that platform with the victims shortly before their deaths. In any event, Clemons’ supposedly involuntary statement is equivocal on this point because Clemons maintains throughout the statement that he did not play any role in the victims’ deaths. Far more compelling are Clemons’ statements: (a) to- Officer Williams (Clemons fell in with the wrong group, raped two girls, heard an accomplice say he would not allow the victims to identify them, and threw them off the bridge); (b) to his accomplices Gray and Winfrey as he ran from the bridge (“We threw them off”); and (c) to his friends while watching a later news account of the crime (“I did that”). Two transitory hearings of Clemons’ audiotaped statement cannot have made anywhere near the impact on the jury that these statements made, and these statements pale in comparison to the transcribed statements Cummins and Winfrey made that were sent to the jury room at the jury’s request (without objection from Clemons) and that recount at great length the factual details supporting Clemons’ guilt and culpability. ‘ '
Like the Master, therefore, I am troubled by the fact that Clemons has now succeeded in having his convictions and sentences wiped away despite the fact that there is no likelihood that the jury would have reached a different verdict if they had not heard Clemons’ audiotaped, statement; a self-serving statement that, in context, played no significant role in the state’s case and was relied upon more at trial by Clemons than by the state. Accordingly, I respectfully dissent and would deny Clemons’ petition on its merits.

, Once, an inmate has exhausted his rights to trial, to direct appeal, to move for post conviction relief, to appeal if that motion is over- - ruled, and to further review in the federal trial and appellate courts, a compelling argument can be made that no conviction should ever be set aside except upon a clear and corivincing showing of actual innocence. See Clay v. Dormire, 37 S.W.3d 214, 218 (Mo. banc 2000) (“actual innocence component is all the more appropriate for Missouri cases given the fact that defendants are already afforded an initial habeas-like post-conviction relief proceeding ... in which constitutional claims ... like those that'so often appear in habeas corpus petitions may be presented”).

. Ironically, the principal opinion asserts that Clemons’ actual innocence claim — the only claim that he raised in his petition — is not "preserved.”- At the same time, however, the claim on which the principal opinion grants relief was never pleaded. In fact, the only document that might indicate whether — and how — such a claim was even argued to the Special Master is the transcript of the oral arguments to the Master on March 18, 2013. That transcript is not part of the record before this Court.

. The only other claim in the 2009 Petition is a claim that Clemons’ death sentences are not proportional in light of the fact that his accomplice Antonio Richardson’s death sentences were commuted. Clemons previously .raised this claim in this Court, and the Court rejected it on the merits. See Clemons v. Roper, Case No. SC89534 (Mo. banc 2008).

. After the Master gave this warning, Clemons (and his lawyers) reconsidered his refusal to answer the following three questions and, instead, ánswered each of them: “No.”
Q: And then you and Tony [Richardson] made those three people — Tom [Cummins], Robin and Julie — get down one level lower, down on the bridge supports, didn't you?
Q: Isn’t it true that you stood on that platform by the manhole and you blocked their escape so there was nowhere that they could go?
Q: Those girls couldn’t escape because you were blocking their way, weren't you?
As to the remaining questions, Clemons refused to answer and the Master drew the negative inference he warned Clemons he *95 would draw. Clemons, did not object to this inference then, and he does not object to it now.

. Like a writ of certiorari, a writ of habeas corpus is a means of review, not a remedy. Under this Court's rules, the petition for writ of habeas corpus is an introductory pleading in which the inmate must "set forth facts that would establish the illegality of his confinement[.]” Jaynes, 63 S.W.3d at 217. If the petitioner fails' to do so, the petition is to be denied withoüt á hearing or review of the original trial record. Id. But if the petitioner *97 makes a prima facie case that his confinement is illegal, the writ (or a show cause .order) will issue to initiate review. The respondent then is required to file a return alleging facts proving that the petitioner’s confinement is legal. The petitioner then files a traverse in which he admits or denies the facts pled in the return. Then, but only then, are the pleadings "joined.” Abel v. Wyrick, 574 S.W.2d 411, 415 n.1 (Mo. banc 1978) ("in habeas corpus the issues are framed by the return and the traverse by way of reply”). If material facts are disputed, a master can be appointed to take evidence and make recommendations. If not, the Court will order briefing and decide the case.
Here, Clemons filed a petition and, before the respondent could offer suggestions as to why the petition was insufficient on its face, the Master was appointed to "take evidence on the issues joined.” But, with no pleadings, there were no "issues joined.” The touchstone for controlling the scope of discovery— to say nothing of a hearing — is the scope of the factual questions raised, by.- the pleadings. The state appears ncjt to have objected to the lack of pleadings, or to the lack of any motions to amend Clemons’ pleadings, or to the ever-widening scope of Clemons’ discovery and arguments.

. The two elements of a Brady violation (i.e., "nondisclosure” and "materiality”) are sometimes referred to as three elements by breaking "nondisclosure” into two elements. See Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936 (Brady requires: (1) "nondisclosure;” (2) of evidence that is "favorable to the accused, either because it is exculpatory, or because it is impeaching[;]” and (3) "materiality”).

. Weeks testified that he thought the swelling on Clemons' cheek might have been caused “by a spider bite.” ’

. There is no question that Clemons had the PTR Report more than a year before his trial. Clemons’ counsel had the disclosure correspondence (found at page 506 of the. original Legal File) marked as Exhibit 13 for the Master's hearing, and the Bates stamp on this document shows that it was produced from the files of Clemons’ original, trial counsel. Ip addition, both Clemons' interview with Weeks and Clemons’ PTR report are mentioned in, and attached to, the report from Sergeant Huelsmann of the Internal Affairs Division, which found Clemons’ allegations of abuse to be unsubstantiated. The copy of the PTR report that was admitted at the Master's hearing has a Bates number that identifies it as having been produced by "IAD” as an attachment to that report, which the Master included as Exhibit 1 to his Report. Clemons has known about the IAD’s report , since August 1991, and the state disclosed the IAD’s report to him no later than September 1992. Accordingly, there is no doubt that Clemons had the PTR report and knew who Weeks was (and why he was important) long before trial.

. As noted previously, Clemons has been allowed to argue many claims that he failed to plead in his 2009‘Petition, including the claim on which the principal opinion now grants relief. For most of these claims, Clemons’ apparent exemption from the ordinary rules of pleading merely resulted in an extension of the Master’s process and a certain degree of- *105 fuzziness in the precise contours of the arguments Clemons has advanced. On Clemons’ Brady claim regarding Weeks, however, the cost of freeing Clemons from the rules of pleading is much greater.' Not only is there no Brady claim regarding Weeks in the 2009 Petition, at no time in the years leading up to — and through — the Master’s hearing did Clemons ever argue a Brady claim relating to Weeks. The Master noted at the end of the hearing that the record would be held open to allow Clemons' counsel time to depose Weeks but, even then, there was no suggestion that Weeks’ information would constitute a separate Brady claim. The claim was so unforeseen that the state’s proposed findings and conclusions make no mention of it — or Weeks — at all. More importantly, because this claim was never briefed before the Master, the treatment of this claim in the Report lacks the same orderly and detailed analysis given to every other claim on which the state (and the Master) had at least informal notice.

. See also United States, v. Graham, 484 F.3d 413, 417 (6th Cir.2007).("there is no Brady violation, if the defetfdant knew or should have known the essential facts permitting him to' take advantage of the information in question, or if the information was available to him from another source”) (emphasis added); Carter v. Bell, 218 F.3d 581, 601 (6th Cir.2000) (same); United States v. Rodriguez, 162 F.3d 135, 147 (1st Cir.1998) (The government has no Brady burden when the necessary facts for impeachment are readily available to a diligent defender") (emphasis added); United States v. LeRoy, 687 F.2d 610, 618 (2nd Cir. 1982) ("Evidence is not ‘suppressed’ if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence”) (emphasis added and citation omitted); United States v. McKenzie, 768 F.2d 602, 608 (5th Cir. 1985) (“Brady does not oblige the government to provide the defendants with evidence that they could obtain *106 from other sources by exercising reasonable diligence”).

. To be clear, the fact that Clemons has known about Weeks’ subjective impression regarding Clemons’ appearance since Weeks, remarked to Clemons about it also means that there was no "nondisclosure” for purposes of establishing a -Brady violation. As the Master’s conclusions regarding the draft police report show, there is.great overlap between "cause” and “nondisclosure.” See, e.g., Graham, 484 F.3d at 417 (there is no Brady . violation when defendant knew or should . have known of the essential facts or the evidence was available from another source through reasonable diligence); Coleman, 268 F.3d at 438 (same). For present purpos'es, however, Clemons' knowledge and the state’s complete disclosures are addressed under "cause” merely to keep that analysis distinct from the fact that — even if Weeks had not remarked to Clemons about Clemons’ appearance, and even if the state had not disclosed Weeks’ name and the PTR report — this is not the sort of exculpatory or impeachment evidence that comes under the reach of Brady and Giglio.

. On March 18, 1996, the motion court overruled' Clemons' motion for post conviction relief based, in part, on the following factual finding:
With respect to movant’s injuries, the only credible evidence was that, after the homicide detectives questioned him and obtained his statements, [Clemons] was taken to prisoner processing for booking (approximately 2:00 a.m. on April 8, 1991). As part of the processing procedure movant was fingerprinted and photographed. .'Joyce Taylor, the clerk who booked movant, stated that movant had no injuries on or about his face when he was booked. It was not until Tuesday April 9, 1991, after spending over 24 hours in the holdover, that movant was observed to haye the right side of his face swollen. , (See Findings of Fact paragraph 24; counsel and/or movant’s mother apparently confused admission to City Jail with ‘booking’ which took place at Police Department’s Prisoner Processing section).
Order Denying PCR, at 42-43. The finding referred to states: "On cross-examination, [Clemons’ trial counsel] said that there were no medical records which supported movant’s contention that he had been struck ten to twenty times.” Id. at 8. Although Clemons’ mother told defense counsel “that the ‘booking records’ indicated injuries at the time of ‘booking,-’ ” id. the motion court found that this was a reference to Clemons’ intake at the city jail on the afternoon of April 9,. not his booking at PPD that occurred nearly 36 hours earlier at 2:28 a.m. on April 8. Id. 42-43.

. These photos were marked as exhibits H, I, and J in the hearing before the Master and were marked as state’s exhibits 106, 107 and 108, respectively, in Clemons’ criminal trial. In the Master’s hearing, Waller testified to having taken these photos at approximately 2:40 a.m. on April 8, 1991, and Clemons admitted that they were taken during his *110 booking. Clemons’ efforts to introduce doubt about these facts merely by saying he-does not believe them is unavailing. There is no question that the booking photographs were taken at 2:40 a.m. on April 8, and the Internal Affairs photographs were taken on the' afternoon of April 9. .

. Except for short periods when Gray was being photographed,, printed and interviewed in Pre-Trial Release (as Clemons had been), Clemons and Gray were together in the men’s holdover from 6:58 a.m. on April 8 until 7:30 a.m. on April 9, At that time, they were transported to the criminal courts building, where Clemons and Gray were together again in the holding pens between 8:00 a.m; and noon.

. Thes.e photos were marked as exhibits K and L in the hearing before the Master and were marked as state’s exhibits 109 and 1 Irrespectively, in Clemons' criminal trial. Clemons admitted they were taken by Internal Affairs on April 9, and they were described and attached to the Internal Affairs report rejecting Clemons' (and Gray’s) claims of physical abuse as "unfounded” and "not sustained,”

. There is no clear explanation of how or why Clemons was seen at Regional on the evening of April 9, 1991. According to Clemons’ mother, Judge David ordered him to be examined during his arraignment that morning. Report at 68.' Assuming that is what happened, the Master pointed out that there is "no evidence in the record that Judge David made an independent determination that Clemons was hurt.” Id. Instead, Clemons’ counsel admitted during his testimony in Clemons’ Rule 29.15 proceedings that "Judge David told him that he did not see too much to complain about, but when anybody says he is hurt, Judge David said, I automatically make sure they get to the infirmary.” Id.

. This is the analysis used in Barton v. State, 432 S.W.3d 741, 761 (Mo. banc 2014), in which this Court held that impeachment evidence was not material for Brady purposes when there was evidence that corroborated the testimony of the state's witnesses because such corroborative evidence "serves to minimize any damage that might have been done to [the witness’s] credibility by the introduction” of the undisclosed evidence'. See also Wilson v. Whitley, 28 F.3d 433, 439 (5th Cir. 1994) (“when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material").

. As context for this explanation, Kyles provides a synopsis of the various standards used to determine which errors are sufficiently prejudicial to merit relief. The Court first noted that, on direct appeal: (1) ordinary trial error does not require reversal .-unless tire error had a ‘‘substantial and injurious effect or influence in determining the jury’s verdict,” Kotteakos v. United States, 328 U.S, 750; 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); but (2) a constitutional error always requires reversal unless the error “was harmless beyond a reasonable doubt,” Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Kyles, 514 U.S. at 435-36, 115 S.Ct. 1555. After a conviction is final, however, those rules change., Then, an inmate will not be entitled to habeas corpus relief unless he can show both a constitutional error and that the error had a "substantial and injurious effect or influence in determining the jury’s verdict.” Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting Kottéakos, supra). But, as Kyles explains, Agurs rejected the Brecht stari-dard for Brady claims because " ‘the constitutional standard of materiality must impose a higher burden on the defendant.’ ” Kyles 514 U.S. at 436, 115 S.Ct. 1555 (quoting Agurs, 427 U.S, at 112, 96 S.Ct. 2392) (emphasis added). Agurs adopted the "reasonable probability that a different result would have occurred” formulation of materiality (that later also was adopted as the test for prejudice in Strickland) only after expressly noting that this standard would recognize reversible constitutional error only when the harm to the defendant was greater than the harm sufficient for reversal under Kotteakos. Id. (emphasis added).

. See also Johnson v. Folino, 705 F.3d 117, 129 (3d Cir.2013) ("The materiality of Brady material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state.”); United States v. Bartko, 728 F.3d 327, 340 (4th Cir.2013) (nondisclosure not material under Brady where "record reveals overwhelming evidence of [defendant’s] guilt”); United States v. *115 Qunbar, 335 Fed.Appx. 133, 136 (2d Cir.2009) (nondisclosure not material for Brady purposes "in light of the government’s substantial alternative direct evidence” of guilt); Coleman v. Mitchell, 244 F.3d 533, 541-42 (6th Cir.2001) ("even if [undisclosed evidence] had been supplied to him, the verdict would have been the same because the quantity and quality of the evidence introduced to prove Coleman’s guilt was overwhelming”); Paradis v. Arave, 240 F.3d 1169, 1177 (9th Cir,2001) ("It is true that if the verdict is supported by overwhelming evidence of guilt, then undisclosed exculpatory evidence that undermines only a small part of the prosecution’s case may not be sufficient to undermine confidence in the outcome” under Brady,); Grandison v. Corcoran, 78 F.Supp.2d 499, 507 (D.Md,20.00) ("considering the material claimed to have been withheld, in light of the overwhelming evidence against Grandison, the Court is of the opinion that there is utterly no chance that these materials, had they been furnished, were such that they could reasonably be taken to put the whole case in a different light so.as to.undermine confidence in the outcome”); Com. v. Willis, 616 Pa, 48, 46 A.3d 648, 665 (2012) ("materiality of Brady material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state”) (quoting Sipe, 388 F.3d at 478).

. This principle is not only firmly established, it is also routinely employed. In Strickler, the Court found that evidence was not material under Brady because the "record proves strong support for the conclusion that petitioner would have been convicted of capital murder and sentenced to death, even if [the only eyewitness to the murder] had been severely impeached [by the undisclosed evidence].” Strickler, 527 U.S. at 294, 119 S.Ct. 1936 (emphasis added). And, in Cone v. Bell, 556 U.S. 449, 474, 129 S.Ct 1769, 173 L.Ed.2d 701 - (2009), the Court- affirmed the lower court’s determination that the undisclosed evidence "would not -have overcome the overwhelming evidence of Cone’s guilt in committing a brutal double murder and the persuasive testimony that Cone was not under the influence of drugs.” Id. at 464, 129 S.Ct. 1769 (quoting Cone v. Bell, 492 F.3d 743, 756 (6th Cir.2007)) (emphasis added).

. Clemons hedges his bets by suggesting that, even if the trial .court overruled his motion to suppress, “CJemons would undoubtedly have benefited from having the jury hear Weeks' unbiased account of the injuries ... and the prosecutor’s effort to convince him that he was mistaken about what he saw.” - Clemons fails to explain why this "undoubtedly” would have altered the outcome of the trial, and there is no reason to believe it is so. At trial, not knowing whether Clemons would testify or not,- the trial court admitted testimony (like Weeks’)- that Clemons’ face appeared swollen in the hours and days after he finished giving his audiotaped statement. After Clemons refused to testify at trial, the trial court ruled that, because there was no evidence from any source that Clemons was beaten by the detectives during his interrogation, defense counsel could not argue that the jury could infer Clemons had been beaten from the fact witnesses later saw his face swollen. The court said:
As I said from the beginning, counsel is permitted to argue the evidence and the reasonable inferences from the evidence. I don't think that the fact that the defendant may have suffered some injuries at some point after — or has visible signs of injury at some point after he was interrogated, and when the officers have denied that they did it, and he didn't take the stand [to say they did], I don't think that there is a reasonable inference that they did 'it. I think you can argue Thomas Cummins was roughed up because there is evidence.” •
Tr. p. 3220. This is one of the few rulings Clemons has not challenged in the 20 years since he was convicted, and he does' not challenge it now.

. Initially, Cummins identified the attackers as one Caucasian, and three African Americans whom he characterized as: (1) the leader and apparently oldest member; (2) the tallest member; and (3) the youngest member.. Later, Cummins identified Winfrey as the Caucasian member of the group, and he identified Clemons as (1), Gray as (2), and Richardson as (3).

. The Court noted in the margin: “Even if appellant did not make [this] statement, it is reasonably inferred that it was made in his presence.” Clemons, 946 S.W.2d at 216 n.l,

. For example, Clemons’ supposedly coerced statement does not admit that, as he and Richardson were running off the bridge, Clemons yelled to Winfrey and Gray: "We threw them off the bridge, ”

. There was never any contention that this statement was coerced. Instead, Clemons moved to suppress this statement on the basis that it wás given without 'Miranda warnings. The trial court' overruled that motion, ruling: “Detective Williams went to see the defendant sometime after he had been interrogated ... which would mean he had already been given his Miranda rights. And, again, I’m not solid on the law on this. But it seems to me that [it is irrelevant] whether or not he — Detective Williams — whether or not he went as a friend or not,' as an investigator.” Id. at 1767. Clemons is not challenging the admissibility of this statement, and it would have been admitted even if the trial court had found that Clemons’- audiotaped statement was coerced.

. As noted above, the Court should not even be reviewing this claim because it was not raised in Clemons’ 2009 Petition or any amended or supplementary pleading, it was not one of the issues this Court appointed the Master to hear, and it '‘arose”'so late in the Master’s proceedings that it was never mentioned at the Master's evidentiary hearing or in the parties’ initial arguments and would not have been mentioned in the Master’s report but for his having left the record "open” to allow for Clemons’ last-minute deposition of Weeks.